Lipscomb, J.
In my investigation of this case, I propose first to take up the doctrine embraced by the two first points made by the counsel for the appellee.
The broad proposition lias been laid down that, by the Revolution that separated Texas from the rest of Mexico, all titles of lands previously obtained were annulled, and that none of them, in propria vigore, could have a standing in court; that to give them life and energy, required the action or sanction *36 of the political authorities of the new Government. That this doctrine can he found once to have had standing in the jurisprudence, though rarely openly asserted, of England, may he admitted; but it has long since become obsolete. And we are sincerely persuaded that a judicial recognition by this court of its resuscitation and its vital influence on rights of property would shock the moral sense of the civilization of the nineteenth century. In the early ages, when the rights of the common masses were but little considered and cared for, and all power and all right was permitted to be deposited in an individual personal"sovereignty, it is a melancholy fact that the doctrine was too well sanctioned by the practice of kings and princes of those times. Then the houses and lauds, flocks and herds, husbands, wives, and children of a conquered country became the spoil of the heartless conqueror. That age has passed away, and a milder and more enlightened one has ¿succeeded. The masses of the people have felt their strength, and made the tyrants feel it too, and in this moral regeneration a more elevated sense of right, of justice, and the laws of humanity has asserted an ascendency over the cruelty and despotism of tlie past. It instructs and commands, in a language that will be obeyed, the commanding general that he shall use no unnecessary rigor even to (he prisoners taken in battle; that to the peaceful citizen, not found in the ranks of war, ho is to extend the arm of protection to his person and property; that he is to make no innovation upon the laws and customs, only such as are necessary to the security of the army aud retention of the territory acquired. On this subject, public opinion in almost every civilized community, has proved one of the most humane and beneficial portions of the law of nations.
The language of Mr. Justice Baldwin, in the case of the United States v. Mitchell, (19 Pet. R., 734,) .is, “ That the inhabitants, citizens, or subjects of a conquered or ceded country, territory, or province retain all the rights of property which have not been taken from them bj1" the orders of the conqueror or the laws of the sovereign who acquired it by cession, and remain under their former laws until they shall be changed.” The language of the late Chief Justice Marshall in tiie case of Juan Perchman (7 Pet. K.) is so very explicit and appropriate that it will not be deemed improper to insert it. He says: uIt may he worthy of remark that it is very unusual, even in eases of conquest, for the conqueror to do more than displace the sovereign and assume dominion of the country. The modern usage of nations which has become law would he violated; that sense of justice and right which is acknowledged and felt by the civilized world would be outraged if private property should be generally confiscated aud private rights annulled. The people .change their allegiance; their relation to their ancient sovereign is dissolved, hnt their relation’ to each other and their rights of property remain undisturbed. It will be found on an examination that the several Florida eases decided in the Supreme Court of the United States sustain this conclusion : that in the absence of any order, decree, or law of the new sovereign, and in the absence of any treaty stipulations, individual rights of property would remain unchanged ; and that a treaty stipulation to that effect is nothing more than the assertion of a great moral principle of the law of nations, anti would have been equally as well settled without such stipulation. The same doctrine is believed to have been recognized by an English adjudication in the case of Picton, Governor of Trinidad', in the absence of any treaty stipulation, and resting solely for its support on the modern law of nations.
It would seem that, so far as respects a change of Government brought about by a conquest or a cession, the doctrine has been well and firmly established; and it would be difficult to conceive, on any known principles of reason or just regard to the rights of man, why a change made by the people themselves should subject their rights to different and harsher rules of construction. It is indeed a principle that seems to pervade the whole social relations of man that laws, customs, and usages, when once established, shall continue until *37 abrogated by tlie introduction of new ones — our sympathies to such influences and reason approve them just and right; and in truth it is hardly possible to conceive of a civilized people existing where all laws and customs and all tlie elements of the social relations have been dissolved. Old habits and customs must prevail until new ones have been established. In the case of conquest it is undoubtedly true that it is in the power of the conqueror to destroy all the lights of the conquered, but in doing so the most flagrant outrage would be done to the moral sense of the age, an.d such as would never be presumed to have been perpetrated without the most positive and explicit affirmation of its author, and when avowed would justly place him beyond the pale of civilization. So in case of a peaceful change of government by the people assembled in convention for the purpose of forming a Constitution as the fundamental law for the protection of the three great objects of all governments based on the rights ■ of man — life, liberty, and property. It would be in the power of such convention to take away or destroy individual rights, but such an intention would never be presumed; and to give effect to a design so unjust and unreasonable would require the support of the most direct, explicit affirmative declaration of such intent.
It is not at all unlikely, nor indeed is it a matter of surprise that it should be so, that we are led to false and erroneous conclusions on the subject of eminent domain, fealty, and alienation of landed property by early impressions derived from sources entitled to more consideration in determining what the law is in the country of onr ancestors than in establishing what it now is in our land on those questions. Tlie great fathers of English jurisprudence built up a judicial system eminently adapted to sustain the whole object of the feudal tenures; with them a regard, bordering on idolatry, was inculcated for the prerogative rights of the crown. It was supposed to be the source of not only all grants of land, but of every other right and privilege, enjoyed by tlie subject, and this fount and head of all was called the sovereign power. It was a corporeal and personal sovereignty, vested in a particular individual, of a particular line of ancestry who wore tlie crown ; the right of eminent domain belonged to that individual without reference to the will of his subjects. All the land not granted by him or bis ancestors, and that became forfeited for offenses or reverted on failure of the heirs of tlie original grantee, was vested in him by virtue of the royal prerogative of eminent domain. He granted or regrauted with a liberal if not ¶, prodigal hand to his courtiers who were, perhaps, the very worst of his subjects; such as had ingratiated themselves into his favor by flattering his vanity or by catering to the indulgence of his guilty and depraved passions. The humble and lowly but meritorious subject seldom received liis bounty. But all were taught to look to the crown as the source of all rights and titles, and as the bulwark of social order. The landholder was instructed by the sages of the law that if the king was dethroned by a successful revolution, all titles would be abolished from the failure of the seource from which they had emanated; that when the fountain failed, the cisterns supplied from it were dried up. It was a part and parcel of a system than which none has ever been devised more eminently calculated to perpetuate hereditary monarchy.
With us the source of titles to land is as different as light from darkness. It flows from a purer and holier fountain. It is from the sovereign power, not an individual, personal sovereignty, but from tlie free and sovereign will of the people, defined and expressed by well-regulated laws of their own making; and so long as this source of power is sustained, all popular governments may reform their organic law at pleasure without destroying rights, even according to the most fastidious regard to the principles of prerogative rights; because by such changes the source of power being in the people, that’sourcc is not destroyed. Such was the revolution that changed the relations between Texas and tlie other parts of tlie Mexican Confederacy to which she had been *38 attached. The majesty'of the law was not destroyed; it was in the people, and it still remained in them under a different modification of the government.
There is another aspect in which this question may be presented that will show still more conclusively the soundness of the principles discussed and of the conclusions to which we have arrived. The term “revolution,” when used in reference to governments, has a positive and a qualified meaning: when employed in the first it supposes a radical change of the whole system and structure of the government; when in the latter it conveys the idea of a modification only. The Revolution of Texas was clearly of the last description. As a seceding part of the Mexican Confederacy, she was not left without laws made by herself, or without the proper officers for administering them. This was practically the case. The old laws continued to be administered through the instrumentality of the old officers until the. establishment of a new system, and until changed were supposed to exert the same binding i'rfluenee in the protection of persons and property that liad been claimed for them before the relations between Texas and the other parts of Mexico had been changed. In fact the hotly of our jurisprudence remained the same until the introduction of the common latv by the act of Congress in 1840. Nor can it with any degree of propriety be said that wo were sustaining the laws of Mexico, with which power we were then in open hostility, because they were law's made by ourselves as much as by the other parts of Mexico forming the Confederacy. When those laws were made and rights acquired under them we were a part and parcel of the Republic of Mexico and participated in their making. They were therefore our own law's. The Revolution worked less of a change with us than it did in other parts of Mexico with which we had been associated by tlie Federal Constitution. We continued the same popular representative government emanating from the people. They' destroyed the Constitution of 1824, that had guarantied a free popular government, and submitted to a military despotism. And it may therefore be replied to the question so emphatically propounded to us — what was the obligation imposed on Texas to respect the law's of Mexico ? — none, not the least. Rut she was under the most sacred obligation to defend and support her own laws and to protect the rights of her own citizens.
If, however, we had arrived ata different conclusion, and believed that some affirmative act of recognition by the Government of Texas was necessary to give validity to titles that had been perfected under the former organization, whilst a component part of the Mexican Confederacy, it is believed that, so far as perfect titles are concerned, that recognition lias been abundantly made by the people of Texas, in convention and by the acts of Congress of the Republic, as it will be shown. It was said that by the Declaration of independence on tlie part of the people of Texas all laws in force before were annuiied, and that from its date until the Government was fully organized under the new Constitution, we were without law', either civil or criminal. A reference to that instrument affords no support to any such conclusions. It isa most eloquent exposition of the canses that induced the people to make, (hat declaration and encounter tlie peril it would necessarily draw' upon them ; but it contains nota syllable that is in the slightest degree repugnant to the declarafiou we find in" the first section of the schedule to the Constitution immediately following the Declaration of Independence. It is expressed in tlie words following : ‘
“That no inconvenience may arise from the adoption of this Constitution, it is declared by this convention that all laws now' in force in Texas, and not inconsistent with the Constitution,' shall remain in full force until declared void, repealed, or expire by their own limitation.”
What an absurdity to declare all law's shall continue in force if there were no laws ! And how senseless to suppose the existence of laws without validity in regulating rights and enforcing remedies! If the convention meant any *39 thing, it must be that the laws in force before the separation from the Mexican Confederacy should he so continued in force. The provision in the first section of the schedule is precisely the same that we find in most of the new constitutions made by the different States where no radical change is designed. The laws regulating the tenure of real estate are not in express terms mentioned, nor are those governing the acquisition and transmission of personal property; hut it has never been doubted that property of every description found the same protection derived from those laws that secured it to the owner before the change of the Constitution. It has never been doubted that the people in convention assembled had the faculty to annul and destroy private rights, but it is believed that to do so would require a direct affirmation of such intention. This power was exerted by the convention that framed the Constitution of the ltepnblie. In the tenth section of the general provisions, in the third paragraph of that section, will be found the expression of the will of the convention in the following words:
“Whereas the protection of the public domain from unjust and fraudulent ■claims and quieting the people in the enjoyment of their lands is one of the great duties of this convention; and whereas the Legislature of Coalmila .and Texas having passed an act in the year 1834 in behalf of General John T. Mason, of New York, and another on the 14th day of March, 1833, under which the enormous amount of eleven hundred leagues of land has been ■claimed by sundry individuals, some of whom reside in foreign countries and are not citizens of the Bepublic, which said acts are contrary to articles fourth, twelfth, and fifteenth of the laws of 1824 of the General Congress of Mexico; .and one of the said acts for that canse has, by the said General Congress of Mexico, been declared null and void;—
“It is hereby declared that the said act of 183-1, in favor of John T. Mason, .and of the 14th of March, 1833, of the said Legislature of Coalmila and "Texas, and each and every grant founded thereon, is and" was from the beginning null and void, and all surveys made under pretense of authority derived from the same are hereby declared null and void. And all eleven-league -claims located within twenty border leagues of the boundary line between Texas and the United States oE America, which have been located contrary to the laws of Mexico, are hereby declared null and void.”
If there had been no such provision as we find in the first section of the schedule this section just recited from the general provisions would most ■ clearly have shown that the convention did not intend to destroy any good and perfect titles held by a citizen of Texas before the change of Government, but those specially named and annulled. There is a provision in the treaty, by which the United States acquired Florida from Spain, annulling- the grants to the Duke De Alegon, to Bueno Bostro, ánd Vargas, from which a'legitimate conclusion, it was thought by the Supreme Court of the United Slates, could be drawn, that those were the only individual titles intended to he destroyed. The same conclusion could be drawn, that the convention did not intend to destroy any other titles than those named. Taking the first section of the sehedule'with the tentli of the general provisions it would seem that the convention did not intend to destroy any rights or titles but those enu-unerated and specially named.
"VVe have devoted more attention to this branch of the case than was, perhaps, called for. We have not done so, however, from any difficulty at coming to a conclusion, but from the fact that it is a question well calculated to disturb the tranquillity of the old settlers and those claiming under them. And we believe it is our duty to remove such groundless apprehensions, and to give repose on this subject. Much of the time of the court has been occupied in ■describing the distinction between perfect and imperfect titles. And wc have; uniformily decided that, in case of imperfect titles, to give them a standing in •court required the action of the political authority; but if consummated *40 before the change of the Government and owned by a citizen of the Republic, they were valid without any act of the political authority. These decisions; sustain the conclusions we have arrived at on the point we have been considering; else, why the necessity of establishing the distinction if all were void, both perfect and imperfect, without the action of the political authority?
We will now turn our attention to the grant whieli was relied on by the plaintiff in this ease in support of his title to'the land sued for. (See tlie grant set out in the statement of this case.) We will endeavor to arrive at a correct construction of this grant from tlie terms in which it is expressed, and by resorting to such evidences as are accessible to us of the character and principles-on which the Indian missions were founded.
Tlie grant on its face shows that it was a limited title intended to be conveyed. It was granted to tlie Indians of the mission of San Jose, for their labors, pastures, and other purposes, without the right of alienating, ceding, or selling any part thereof without the superior license of the Supreme Government of the kingdom. Tlie plaintiff contends that it conveys the fee-simple,, subject to be divested only on a sale without the license expressed, and that it can only be taken advantage of by the Government.
Let us examine into tlie subject. Had the grant purported to be in fee, subject to a forfeiture on failure to do some particular act. perhaps there would be some soundness in the argument. But the inhibition to sell or alienate is-inconsistent with tlie fee. And there is another part of the grant that seems-to fix the true character and extent of the right couvoyed by the grant. It is-that tlie Indians are to receive it “sin media annata.'1'1 This has been translated in tlie record sent up “without interest.” This translation is not believed to be. correct; tlie correct translation is “without tlie payment of half-yearly profits; ” and a reason is assigned for such remission of the half-yearly profits; that is, because they are Indians of the mission of San Jose, to-whom tlie grant is made. It shows that tlie character of the grant was not to-be changed by such remission; that it would have been due on such-sale or grant; and tlie “media annata” characterizes it as a tenancy, and not as a. purchase in absolute dominion, constituting a feud. Drs. Manuel and Asso-say, in the Institutes of the Civil Law of Spain : We only observe one remarkable difference in point of succession or descent, for lib. 6, tit. 2G, p. 4, says that the succession does not descend beyond the grandson, but returns to tlie lord; and it is clear that, by the feudal common law, tlie succession was extended in infinitum. (2 White, 80.) And they say that the “ media annata ” was given in lieu of military service. (Id., p. 79.) The inhibiting the sale show's that tlie fee was intended to be retained in the grantor or feudal lord; • and but for the expression, that the “media annata”' is not to be exacted, the Indians would have been liable to pay it every half year so long as they enjoyed tlie usufruct.
It is probable, however, that this kind of title was known under the laws of' Spain as composition, and the title created the holder a tenant at will. In lib. 4, tit. 12, law 15 of the New Recopolacion, under the head of lauds to be let to composition, we find as follows : “All lands which are to be admitted to-composition, shall be sold at auction, and without reserve, to the highest bidders, as tenants at will.” (2 White, 53.)
And again, in lib. 4, tit. 12, law 19: “No one shall be admitted to composition who shall not have becu in possession thereof for tlie term of ten years, although he should state that lie was in possession at the time, for such circumstance by itself is not sufficient. And communities of Indians shall be admitted to composition in preference to other private individuals.” (2 White, 54.) The land in question was sold to the highest bidder; and it will be seen, by reference to the proceedings in the process of proving the title to the Indians of tlie mission, that their having been long in occupancy and pos— *41 session of the lands for pasturing their flocks was urged as giving to them a right of preference over the claim of Castillo.
For the purpose of better understanding the principles on which the Indian missions were founded, the object of such foundation, and the customs and regulations by which they were governed, I will now advert to the oral testimony taken on the trial of this case in the court below. I am aware that it may bo said that this evidence is objectionable, as some more authentic evidence must exist on this subject. In answer, I will only reply, that I am not advised of such evidence, and if there be such it is not now accessible; and oral evidence of the practice and existence of those institutions, if it is secondary evidence, is resorted to because better cannot be procured. And it is a remarkable coincidence that the regulations prevailing in those institutions were-in accordance with the legitimate object of their foundation. I shall mainly rely on the evidence of Col. Navarro and Erasmus Seguin as found upon the record before us.
Col. Navarro states that when he first knew the mission of San Jose there were about six hundred natives there; that these were afterwards killed off, died, or went away, and decreased yearly, until, the last he knew of them, there were only ten or fifteen left; that the Indians of the missions were in a state of pupilage, under the control and guidance of the fathers; that they owned no separate property, but that all the property was held in common, the fathers receiving and selling the products of the Indians’ labor; that the property of the mission was held in los manus mortuous or mortmain; that all the missions on San Antonio river were extinguished by the Government of Mexico about the year 1822 or 1823, and the lands and property appertaining to missions distributed; that witness was commissioned by the Mexican Government to assist in the distribution of the lots and solares near the missions pertaining thereto; the natives were preferred; that on the extinction of the missions all the mission property reverted to the public, and became subject to, distribution as other public property; that witness afterwards, as commissioner or agent for the Government to deliver titles to hinds, did make a title to Ver-mendi for six leagues of land of the lands that formerly pertained to the extinguished mission of Refugio; that when the missions were extinguished the mission property was delivered over to the ordinari; that the missions in the valley of the San Antonio river were under the patronage and protection of the order of Gaudalupe or Gaudalupans, and were founded by the brothers for the propagation of the faith.
Erasmus Seguin states that the Indians lived in a community under the control and direction of the fathers. The products of their labors were received by the fathers. At the end of ten years the Indians were considered as having been converted, and after a probation of two years more they were permitted to leave the mission, and were then considered as entitled to the privileges of citizenship. Before their conversion and the expiration of the two years’ probation they owned no separate property, bnt everything was in community under the control of the fathers; but after their conversion they were given a. suerte or lot of ground, and a title made to them in their own name, which land they had a right to sell, or any of their property, as any other citizen.
The conclusion to be drawn from this evidence is that whatever may have been the object of the founders of the missions, practically they were seminaries for instruction in Christianity and the arts of civilization of such Indians as from time to time should belong to the mission, and that during such connection they were in a state of pupilage to the president of the establishment, and that twelve years was the duration of such pupilage. A grunt then to the Indians-of the mission of San Jose, even if there had boon no words of limitation in the grant, may well, as it was b.y the defendant’s counsel, be compared to a grant made to the students of a manual-labor institute of lands for their experimental farms, or to the students of a university for a campus or common for exer- *42 ciso. In such case it could not for a moment he contended that the right of property was granted in fee to tlie particular students who might, at the time of tlie grant, belong to the institution or to their heirs; but it is manifest that it would only grant the right of way to such of them as from time to time should belong to tlie institution; and should the institution from any cause become extinct, no right would survive to the descendants of the pupils.
The evidence of Mr. Seguin is entitled to great consideration on this subject, because he is a very old man, and was born and always lived in the immediate neighborhood of tlie mission. From his evidence it is clear that as long as 'these Indians were in a state of pupilage they did not enjoy the rights of citi.zenship, but after their pupilage had expired they were considered as naturalized ; were permitted to leave the mission, and had grants made to them in •their own names of a suerte, (a small lot of ground,) which they liad a right to sell, or to sell the profits, as any other citizen. It is worthy of notice that the president of the mission, in his opposition to Castillo’s application, ai.eges ■that these Indians stood in need of the lands for the use of pasturing their flocks thereon, and does not use any term from which it can be inferred that he claimed it for them in full property.
I will next proceed to notice the action of tlie Government in relation to ■the missions and the property appertaining to them. It appears from the .archives of the land office (vol. 50) p. 14-24, title Mission) that tlie missions in the valley of San Antonio were established by the royal order 22d October, 1729; that there was an order for the secularization of these missions, and the distribution of all property appertaining to them for secular purposes, dated 10th of April, 1794. Under this order of secularization it seems that certain proceedings were had at the town of Bexar, by which the lots and all the personal property pertaining to the missions were inventoried and a part of the stock distributed. This appears by reference to the archives in the General Laud Office, and is also shown by tlie evidence embodied in the statement of facts. Missions, so far as related to the faculty of holding property by any tenure, were •from that time considered as extinguished. They existed, however, as a cor-1 poration until dissolved by the decree of the Cortes in 1819. They were extinguished also by the Mexican Government in 18 — . By decree Ho. 177 of the Congress of Coalmila and Texas, of date 29th April, 1831, in relation to the lands belonging to tlie extinguished missions, we find the following action •of the Government:
“Art. I. The Executive is hereby authorized to alienate the lands that pertained to tlie extinguished missions, conforming, in so doing, to the colonization law of 24th March, 1824.
“Art. II. The town property or securities that pertained to said missions •shall be sold at public auction according to law.”
This decree makes a distinction between the lands that pertained to and the town property and securities of the missions. Tlie first was to be alienated in ■conformity to the colonization law. By this we can understand nothing to the contrary, but that it would have been granted to any colonist had application been made for it, or it would have'"been sold to a Mexican, under the XXCVTh article of the colonization law above mentioned. Mr. Navarro says ■that six leagues of the laúd that had appertained to the mission of Refugio were granted to Vermendi; and that lie, as commissioner or. agent for tlie 'Government, had delivered the title. It is very satisfactorily shown that as far as the Congress of Coahuila aud Texas had authority, such lands, after the extinguishment of the missions, were acted upon and treated as a portion of tlie public domain, and this too before the plaintiff in this suit pretends to have acquired any title to tlie land from the supposed surviving descendants «of tiie Indians of the mission of San Jose.
There is another reason why I believe the grant in this case was in *43 composition. It is that the attorney at law representing himself as the attorney or agent in that court for the religious affairs of the holy evangelical mission of San Jose predicates the claim for the lands on the authority of law 10, tit. 12, book 4, of the New Reeopalacion, cited already in this opinion; and the approbation of the attorney general for the Crown was based on the same law. It will be seen by reference to this law aud to law 15 (same book and title) that all lands sold under these laws were only in composition, and the purchasers bought and received titles as tenants at will. If the clause against alienation had not been contained in the grant, I should still have been •constrained to the conclusion, from the proceedings in procuring it, that only tenancy at will was conveyed. In my judgment the protection was only expressed because the beneficiaries were Indians, and it was repugnant to law for them to alienate the lauds so granted. If the result of Castillo’s application had been favorable to him, I believe that he could have taken under the same laws, and only have been constituted a tenant at will; and as he was a citizen a.nd not an Indian, perhaps there would have been no inhibition in the grant against alienation ; but in the event of his selling, his vendee would have been only a tenant at will, and in this aspect it is not at all material to decide whether the grantees toojs: the land as a corporation or as a village or community of Indians, because, if taken in composition, the decree of title would be the same, and the law prohibiting Indian sales would be equally obligatory. I think it may be well doubted whether large grants of pasture lands were •ever authorized, in any case, by the laws of Spain. It seems to have been the policy of Spain, not only in her old dominion, but also in the colonies to encourage a pastoral life. This may fairly be inferred from the regulations of the Measta and the various decrees regulating the us'e and occupation of grazing lands. (See Royal Instructions for selling the San Merced, 2 White, 128, sec. 21; Id., p. 134, sec. 76; see also 2 White, 153, on the Commous and Pasture Grants.)
I not wish it considered that I give much weight to the proceedings at Bexar, in distributing the lots and property pertaining to the mission of San Jose, found in the General Land Office, because such proceedings were not made evidence on the trial; but I have referred to them merely as confirmatory ■of the parol evidence used on the trial of the cause in the court below.
There is one other ground taken by the defendant in this case that I will notice : that is, that if the grant is to be construed to be to the Indians of the ■mission, the plaintiff has not shown that the Indians he claims under are the descendants of those to whom the grant was made. The case was submitted to the court without the intervention of a jury, and the judge had to decide on both the law and the facts. If, in the opinion of this court, the fact of the vendors of the plaintiff', or rather of the parties under whom he claims, being descendants of those Indians has not been so made out, we would have boon •compelled to affirm the judgment of the court below, no matter what had been ■our opinion on the points presented; because it is that right that he claims. I do not understand that the only Indians admitted to a connection with the mission belonged to a particular race or family; but that it was for the instruction of the savages of different bands or nations; consequently the heir-ship by descent would be difficult to make out, and in this case is far from beii'g satisfactory. On this ground, also, I believe the plaintiff failed to make out his ca-e.
In conclusion, I am of opinion that titles, perfect at the date of the Declaration of Independence, and owned by citizens of the Republic at that time, have a standing, in propria vigoro, in a court of law; and that such titles do not require any action of the political authority to give them validity.
That such titles have received the affirmative action of the political authority in their favor.
I believe the judgment ought to be affirmed in this case, because the plaintiff has failed in showing title in himself ;
Note 8. — Hardy v. De Leon, post, 211; Kilpatrick v. Cisneros, 23 T., 113.
Note 9. — See Trevino v. Fernandez, 13 T., 630, for the discussion of the legal effect of composition grants.
That the grant relied on by him as the foundation of title only admitted the Indians of the mission of San Jose to composition, and that it constituted them tenants at will of the Government;
That, by the laws in force at the date of the grant, the Indians could not lawfully alienate their possessions without the consent of the Government;
That, having- seen no evidence of any authority or consent to such sale, it i3 void, and gives no title to the purchaser;
That the lands sued for became, by the extinction of the mission of San Jose, a part of the public domain ;
And that the judgment ought to be affirmed, and it is accordingly affirmed.
Judgment affirmed.