GILES et al. v. BASORE et al.

No. 10166.

Court of Civil Appeals of Texas.

Austin.

March 10, 1954.

Rehearing Denied March 31, 1954.

John Ben Shepperd, Atty. Gen., Jesse P. Luton, Jr., Burnell Waldrep, Asst. Attys. Gen., Wm. J. Merrill, Nelson Jones, Houston, Rex G. Baker, Houston, of counsel, for appellants.

Vinson, Elkins, Weems & Searls, Tarlton Morrow, Houston, Cecil Rotsch, Dan Moody, Austin, for appellees.

ARCHER, Chief Justice.

This suit involves the title to certain land in the delta of the Trinity River. The appellants, defendants in the trial court, are the State of Texas, the School Land Board of Texas, and the Humble Oil & Refining Company, holder of oil, gas and mineral leases on a part of the area in controversy. Appellees, plaintiffs in the trial court, claim title under a grant from the State of Coahuila and Texas to Thomas Jefferson Chambers dated September 23, 1834 of two and one-half leagues of land.

A jury was taken in the case but at the conclusion of evidence, the case, by consent of all parties, was withdrawn from the jury and submitted to the court, and judgment was rendered in favor of appellees, plaintiffs and intervening plaintiffs, and against the appellants, the defendants and intervening defendants for the title and possession of the lands, to wit:

That portion of the lands granted originally to Thomas Jefferson Chambers on September 23, 1834, lying in Chambers County, Texas, and generally described as follows:

The portion of the Delta between Turtle Bayou Pass and Jack's Pass as it existed at the time of the grant to Thomas Jefferson Chambers, namely, September 23, 1834, and as has been extended by natural processes since that date, excluding lands under the bed of the Trinity River, including its several mouths (called passes), identified on said plat and in the field notes, and excluding other lands under other waters within the above general description which are below the vegetation line.

A further description by tracts and a plat were set out and attached to the judgment, which plat is inserted herein:

PORTION OF
TRINITY RIVER DELTA AREA

The appeal is based on the following points:

### First Point

The Chambers grant is void because it was not approved by the Federal Executive of Mexico.

### Second Point

Since no suit to establish the validity of the Chambers grant was brought within the time prescribed by the Act of January 9, 1841, any claim under that grant is now barred.

### Third Point

The Chambers grant did not convey title to the islands in controversy.

There is no dispute as to any material fact. The following facts were stipulated:

"1.

"The sole claim of plaintiffs and intervenors Guy C. Jackson, Jr., et al., to the land in controversy, is under the grant from the State of Coahuila and Texas, dated September 23, 1834, to Thomas Jefferson Chambers, of Two and One-half Leagues of land on Turtle Bay between the mouth of Turtle Bayou and the Trinity River. It is the contention of the State and Humble Oil & Refining Company that the Chambers Grant is invalid and that said grant does not cover the land in controversy. If said grant is held to be valid, said plaintiffs and intervenors have title to such of the land in controversy, if any, as is covered by said grant."

Further stipulation was that the land lies in a typical river delta, that in 1834 the topography of the area was substantially as shown on the United States Coast & Geodetic Survey Map of 1851, marked exhibit "C", that the topography has changed slowly and imperceptibly as the result of natural processes, that the land was on September 23, 1834 within ten leagues of the coast, and that Chambers was appointed Circuit Judge under the Jury Law and the land herein was made to him as compensation for his services.

Appellants contend that the Chambers grant is void, because it was not approved by the Federal Executive of Mexico. The appellees take the position that the law under which the location was made and the land titled to Chambers was enacted after the Congress of the State of Coahuila and Texas had assumed control by legislative enactment[1] of the lands owned by the State, including lands on the seashore and adjacent to the international boundary.

Appellees further say that even if approval by the Supreme Executive of the location of the Chambers land was required because of the proximity of such land to the sea and the international boundary, such approval was had.

The questions of the validity of the several Chambers grants have been before our Courts on other occasions and the historical background, the decrees and laws of Mexico, the State of Coahuila and Texas as well as that of Tamaulipas and the State of Texas, are discussed in numerous cases, such as Chambers v. Fisk, 22 Tex. 504; State v. Delesdenier, 7 Tex. 76; Hamilton v. Menifee, 11 Tex. 718; and Wilcox v. Chambers, 26 Tex. 180, all of which as well as other pertinent cases, are discussed in State v. Balli, 144 Tex. 195, 190 S.W.2d 71; and we shall not attempt any further recitation of such questions other than is deemed essential to an understanding of our views in this case.

The grant was located and titled to Chambers in part payment of his salary as Judge of the Judicial Circuit of Texas under an Act of Congress of the State of Coahuila and Texas; which provided that the salary of the Judge for the first year (beginning in April, 1834) should be paid "with vacant lands situated within the judicial circuit." The Act did not impose any limitation in respect to the nearness

1. Act of March 26, 1834.

of such land to the international boundary or sea (Decree No. 277, 1 Laws of Texas, 364–80, Article 239).

It is to be noted that this law was enacted after the Congress of the State of Coahuila and Texas had assumed control by legislative enactment (Act of March 26, 1834) of the lands owned by the State and had provided for the sale of all vacant lands. (Decree No. 272, 1 Laws of Texas 357–60, Articles 1 and 22).

The Juror Law is set out in full in Sayles Early Laws of Texas beginning at page 107 (1 Laws of Texas, Decree 277, p. 364). The judicial circuit included all of the territory within Texas. Chambers was appointed and qualified as Superior Judge and a salary of $3,000 was fixed per annum, and it was directed that the salary should be paid the first year with vacant lands situated within the judicial circuit, at the rate of $100 for each sitio.

The two and one-half leagues of land here involved was, with other leagues, titled to Chambers. Admittedly, the land is within ten leagues of the sea and is also within twenty leagues of the border.

There were three decrees dealing with the matter of the disposition of vacant lands. The first was in 1825, the second in 1828, and the third on March 26, 1834. The first two Acts imposed a limitation upon the power of its officials in respect of lands within the ten and twenty leagues, which was an adoption of the provision of the National Act requiring the consent of the Supreme Executive Power to grants to colonists of land within the said ten and twenty leagues.

The Juror Law was adopted April 17, 1834.

It is admitted, that absent legislative direction, titles that were prior to March 26, 1834, if within the league limits would require approval. The question is how this approval could be had, either by specific action or general in its quality, such as the approval of an empresario contract to introduce settlers on lands within the ten league limit.

The 1825 Decree and the 1832 Decree provided for empresario contracts and sales directly to Mexicans, fixing of prices, etc.

The Decree of 1834 did away with further empresario contracts and set up a sale at public auction.

The appellees take the position that our Supreme Court has determined that executive consent was not essential, and quote from State v. Balli, 144 Tex. 195, 190 S.W.2d 71, 92, as follows:

"Thus the consent of the State to the application within the limits of section 4, General Colonization Law, is plainly expressed. The State of Coahuila and Texas here undertakes and commands its executive to prevent any settlement whatever, whether by Mexicans or foreigners, and to issue no title to such property within the restricted area unless and until the settler's application for title shall have been submitted with the proceedings thereon to the executive of the union and his approval had thereon. It was only after such approval by the supreme executive that title could lawfully be issued by the state executive and the applicant placed in possession. The federal government could have prevented the immigration of foreigners into this or any other region it chose to designate under its clear constitutional powers and without this state law. So long as this state law remained in force the grant of public lands in the border or coastal leagues made by the state executive without obtaining the prior approbation of the president of Mexico was necessarily void because the power to make such a grant, even to a Mexican citizen, had been especially withdrawn by the state itself from the general powers of its executive.

"Decree No. 190, the state law of April 28, 1832, repealed the law of March 24, 1825, and substituted therefor a similar act, the prohibition of old Article 7, being limited to settlers

'not composed of two-thirds Mexicans'. This was at least a partial withdrawal of the State's consent given by the earlier act, but in the main it left the prohibition in force.

"Decree No. 272, the Act of March 26, 1834, abandoned all previous plans of laws of settlement of the public lands. It omitted all restrictions on the settlements of lands in the coastal and border leagues. In Section 32 it required the state executive to appoint commissioners who should at once issue titles 'to the inhabitants of the frontier of Nacogdoches, and those residing east of Austin's colonies, to the lands they occupy.' These lands were in the border and coastal leagues; therefore this act amounted to an absolute termination of the state's consent to the federal restriction. Indeed, it amounted to a command that in the cases mentioned in Section 32 state grants should at once be issued without the approval of the supreme federal executives.

"In the three cases decided by the Supreme Court in 1848, supra, grants made or attempted under the Coahuila and Texas laws of 1825 and 1832, respectively, without a showing that the prior approbation of the supreme federal executive had been obtained, were held void, the lands of course being within the border or coastal leagues. But, the power of the state executive to issue such grants without such approval under the Act of 1834 was upheld."

The several cases passing on the sufficiency of grants for want of the assent of the executive power because located within the ten or twenty league limit disclose that the rights arose under the State law of either 1825 or 1832, and no such rights arose under the 1834 law since such latter law contained no self imposition and no provision sought to lend validity to the prior law.

As a general rule the assent of the supreme power was essential to the validity of the grant within the border and littoral leagues, and the only recognized exception is where a title in the reserved leagues has been issued under specific authority of a decree of the Congress of the State of Coahuila and Texas. This exception from the general rule has reference to title issued under the decree of March 26, 1834. Smith v. Power, 14 Tex. 146, 147, and cases therein referred to.

The Federal Executive approved Decree 277 which allowed a grant of thirty leagues to the Superior Circuit Judge in payment of his salary (Section 139) in vacant land situated within the judicial circuit and such approval constituted general authority and this is all that is essential. Smith v. Power, supra.

The Constitution of Coahuila and Texas, Article 15 (G., p. 427), provides:

"All kinds of vacant property within its limits, and all intestate property without a legal successor shall belong to the State."

The national government did not attempt to declare invalid any laws of the State, inclusive of the Juror Law, and the Colonization Act of March 26, 1834, until April 24, 1835 (S., art. 45, p. 59). The law sought to be stricken down was:

" * * * the decree of the Legislature of Coahuila and Texas of the 14th of March of the present year."

This was one of the so-called 400 sitio laws. There was no effort to strike down the law of March 26, 1834 or April 17, 1834.

In Smith v. Power, supra, the Court stated:

"The excess of lands within the colonial limits, not necessary for colonial titles, and not to be applied for that purpose, remain vacant."

We conclude that, in accord with the decision of our Supreme Court in State

v. Balli; supra, prior approbation of the Supreme Federal Executive was not essential to the validity of the grant to Chambers.

In view of our holding that the grant was valid, we do not consider in complete detail the points of appellants that no suit to establish the validity of the Chambers grant was brought within the time prescribed by the Act of January 9, 1841, or that the grant did not convey title to the islands.

In 1841 the Congress of the Republic of Texas enacted a law entitled "An Act to quiet the Land Titles within the twenty frontier, leagues bordering on the United States of the North" (2 Gammel, Laws of Texas, pp. 641–643).

The stated purpose of the Act was to remove clouds on titles within the border leagues and provided that claimants under grants issued before March 17, 1836, must file suit within one year, and venue was laid in the District Court of the county where the claim was alleged to lie.

In McMullen v. Hodge, 5 Tex. 34, at page 78, the Court held:

"And we have uniformly decided that, in case of imperfect titles, to give them a standing in court required the action of the political authority; * * * *"

It is pointed out that the source of titles was not that of a foreign government but that of the State of Coahuila and Texas.

In the case of Warren v. Shuman, 5 Tex. 441, at page 457, the Court stated:

"The plaintiff, as is shown by the subsequent confirmation of his certificate, had a dormant right to the land, and as long as the fee remained in the Government, it could be rightfully transferred to the claimant, who had the prior equity. If this could be done by legislative authority, a fortiori, could it be ordained by the convention in the exercise of supreme sovereignty? But these principles have no application to titles such as the defendants', where

the fee in the land had been relinquished by the Government anterior to the passage or at least the operative force of the constitutional provision.

"And the clause in the Constitution, if susceptible of a different interpretation, cannot be construed to divest or annul the perfect rights which by operation of and in conformity with the laws had vested in the defendants. To have annulled perfect rights was beyond doubt within the powers of the convention; but this cannot be assumed to have been their intention unless embodied in express terms or be the result of unavoidable implication." See Hart v. Gibbons, 14 Tex. 213.

There is a stipulation that the records of both Liberty and Chambers counties were destroyed by fire in 1874 and 1875, and consequently neither appellants nor appellees were in a position to prove that a suit had or had not been filed on the Chambers' claim.

In Rivers v. Foote, 11 Tex. 662, 663, it was held that the burden rested on defendant to plead and prove this fact of the loss of title, and cites Paul v. Perez, 7 Tex. 338.

■ We conclude that it was not essential that a suit be filed within one year as provided in the 1841 Act, and that Chambers grant being a valid one, no need arose for the institution of such suit. League v. DeYoung, 2 Tex. 497; McMullen v. Hodge, supra; Hancock v. McKinney, 7 Tex. 384.

■ Appellants contend that there could have been no intent to cross Trinity River, and that the call should have stopped at the first mouth encountered rather than the western mouth.

The field notes of the Chambers grant was for two leagues and a fraction at the mouth of the Trinity River and calls to run from the mouth of Turtle Bayou and with the meanders of the Bay to the western mouth.

We believe that the western mouth called (Boca Occidental) is the correct terminus

of a locative call, and that there was no crossing of the river but the meandering of the Bay and not estuaries, creeks and streams intersecting such tract. Knight v. United Land Association, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974, loc. cit. 990.

We do not believe that the so-called islands have the legal aspect of islands, but are a part of the delta. It is stipulated that they are a part of the typical river delta at the mouth of Trinity River, and that in 1834 the topography was substantially as shown on a geodetic survey made in 1851 and that during the years since 1834 the river has deposited mud and other materials in its delta, resulting in a slow and imperceptible change by natural processes. The added area is the result of natural causes and is a part of the Chambers' title. Humble Oil & Refining Co. v. Sun Oil Co., 5 Cir., 190 F.2d 191.

The delta was surrounded by water. The exterior boundary was the bay, the interior is made up of the main river before it divided into several mouths, and the said several mouths. The measurement of the Chambers' title with its attributes is determined as of the time of its grant and is not determinable by later reservations. Manry v. Robison, 122 Tex. 213, 56 S.W. 2d 438; State v. Grubstake Inv. Ass'n, 117 Tex. 53, 297 S.W. 202.

The judgment of the trial court is affirmed.

Affirmed.

HUGHES, Justice.

I concur in all that the opinion of the Court determines but my concurrence in the holding that the Chambers grant is valid is based solely upon the considered pronouncement by the Supreme Court in the Balli case [144 Tex. 195, 190 S.W.2d 92] that the Act of March 26, 1834 "amounted to an absolute termination of the State's consent to the federal restriction" requiring prior approval of the supreme federal ex-ecutive of Mexico to grants within the prohibited area. Whether, strictly speaking such statement of the law was required for a decision of that case I do not ponder because I believe that an intermediate court, such as ours, should follow clear and considered statements of law made by the Supreme Court.

With respect to the validity of the Chambers Grant appellants in addition to their assertion that what the Supreme Court in Balli had to say regarding the Act of March 26, 1834, was dictum contend that in any event such Act is of no importance here because it was repealed by the Act of May 2, 1834, four months before the Chambers Grant was issued.

This latter Act provided:

"The laws in respect to alienation of vacant lands are hereby dispensed with, to enable the executive, in the manner and on the terms he shall consider advantageous to the state to negotiate with the national executive, those of which he may stand in need." [1]

From authentic historical data contained in appellees' brief, particularly in Appendix E, the conclusion is inescapable, to me, that the Act of May 2, 1834, repealed the Act of March 26, 1834, only insofar as it related to the extent that the State of Coahuila and Texas might deal with the National Government in the sale of vacant lands.

If however, appellants are correct in contending otherwise then this situation is presented:

1. Prior to March 26, 1834, consent of the Supreme Federal Executive was necessary to the validity of sales of vacant lands within the 10 and 20 leagues (conceded by all).

2. This requirement was repealed by the Act of March 26, 1834, (Balli case).

3. The repealing Act of March 26, 1834, was itself repealed by the Act of May 2, 1834, (Appellants' contention.)

1. Gammel's Laws of Texas 386, Decree No. 287, enacted by the Congress of Texas and Coahuila.

934

Upon this state of affairs the question arises as to whether the repeal of a repealing Act has the effect of reviving the Act originally repealed.

At Common Law the repeal of a repealing statute revived the former law. 39 Tex. Jur. p. 154. Such rule of the Common Law was abolished by statute in Texas in 1840. Subd. 7, art. 10, Vernon's Ann.Civ.St.

In the absence of pleading and proof we must assume that the law of a foreign country is the same as ours. 17 Tex.Jur. p. 297.

Applying the above principles to the facts as appellants contend them to be the necessary consequence is that the Act of May 2, 1834, did not revive the requirement that Federal consent to sales of vacant land within the prohibited area be obtained.

I concur in overruling appellants' Motion for Rehearing.