Sayles, S. J.
The first question presented for our consideration arises from the ruling of the court upon the exception to the petition. The exception was peremptory; it goes to the foundation of the action, and, if correctly taken, defeats absolutely the plaintiff’s right of recovery.
This action was instituted by the attorney general in behalf of the State, under the joint resolution of February, 1848, (Hart. Dig., artl 2201,) which reads as follows:
“Be it resolved by the Legislature of the State of Texas, That the attorney general he required to investigate the condition of the claim and title of the State to the various islands included within the limits and jurisdiction of Texas, as defined by the laws of the late Republic, and, if in his judgment it be expedient, to cause legal proceedings to be instituted in the proper State courts against any person or persons'claiming any islands or parts of islands adversely to the State, for the purpose of determining the. validity of such claims,” &a.
This resolution directly authorizes the institution of legal proceedings against persons claiming any portion of the islands, unless it is obnoxious to some constitutional objection.
By art. 3, see. 4th, of the Constitution, (Hart. Dig., p. 54,) it is declared that “ the style of the (all) laws shall he: ‘ Be it enacted by the Legislature of the State of Texas,’ ” and it is urged by the appellee that the joint resolution is inoperative for the want of this enacting clause.
We are of opinion that this clause of the Constitution is inapplicable to acts similar to the one under consideration. Bills and resolutions are mentioned, eo nomine, in different sections of that instrument. By article 3, section 20, it *48 is provided that “bills” shall be read on three several days before they shall have the force and effect of laws.
By section 22 of tiie same article it is declared that no “bill or resolution” having once been rejected shall be passed into a law during the same session.
Every “bill” which shall have passed both Houses of the Legislature shall be presented to the Governor for approval. (Art. 5. sec. 17.)
Every order, resolution, or vote to which the concurrence of both Houses of the Legislature may be necessary must be approved by the Governor, or, in case of his disapproval, shall be repassed by both Houses, according to the rules and limitations prescribed in the case of a bill. (Art. 5, sec. 18.)
Bills and resolutions are named in contradistinction; both do not mean one and the same thing; if they do, unnecessary terms are made use of in the Constitution. The characteristic feature of a resolution is its enacting- clause, “Be it resolved; ” were any other term used, it would cease to be a resolution.
“When the House commands, it is by an order. But facts, principles, and their own opinions and purposes, are expressed in the form of resolutions.” (Cong-. Man., p. 150.)
Of tiie right of the State to appear in her own courts and prosecute suits in her own behalf there can be no question; it is an incident of sovereignty, not dependent upon any statute. It might, with much propriety, be said that it is the duty of the Executive of the State, under that provision of the Constitution which declares that, “he shall take care that tiie Jaws be faithfully executed,” (art. 5, sec. 10,) to cause legal proceedings to be instituted by the proper law-officers in all cases when tiie laws of tiie State are infracted or its rights invaded.
But it would be a great neglect of duty on the part of the attorney general not to institute such proceedings when the opinion of the Legislature and Executive Departments as to its necessity lias been dearly expressed.
The provisions of the Constitution of the Republic of Texas are similar to those of the State Constitution. (See art. 1, sec. 20, 21, and 27.) If there was any doubt as to the meaning and application of those terms and provisions now under consideration, we could refer to the uniform practice of Congress as a legislative interpretation. The framers of the new Constitution undoubtedly used terms and expressions with the meaning that was familiar and sanctioned by long usage.
If the joint resolution of February, 1S-18, has not the force and effect of a law for the want of the enacting clause prescribed by article 3, section 4, then the defendant in this case has no rights whatever, because the Bryan scrip, upon which the patent is based, was issued under the authority of a joint resolution, and the provision of tiie Constitution of the Republic is equally emphatic with that of the Slate Constitution, that the style of all laws shall be : “Be it enacted,” &c. (Art. 1, sec. 22, Hart. Dig., 28.) If this enacting clause is necessary to give a resolution the force and effect of a law, then the Bryan scrip was issued without authority of law and is wholly worthless. We then conclude that the joint resolution of February. 1848, conferred upon the attorney general ample authority to institute the present suit. This resolution is a public statute, of which the court is bound to take judicial notice; it was not necessary that the petition should have averred this authority — it was not necessary to prove it. The ¡rítate was not prosecuting her suit, in the present instance, by virtue of a special enactment creating an exception to a general rule, but slie was exorcising an unquestionable rigid., incident to her sovereignty; the right to sue was not in any way dependent upon the joint resolution — the resolution was the, expression of her purposes, made for the direction of her officer : if he had been called upon to exhibit his authority to appear in her behalf, he had only (o refer to the public statute book.
In oi her respects the petition was sufficiently formal. The title of the plaintiff lo ihe land in controversy, her ownership and right of possession, were averred. There was no necessity of describing the character of her title. Had *49 the defendant craved oyer, her Declaration of Independence, her Constitution and laws, are the deed which she would have exhibited — a deed that the defendant could not have questioned. It was written upon materials more durable than parchment, and sealed with the blood of her sons.
Whatever right the defendant could have to the land was derived from her; he could not question the validity of the title under which his own was held.
There was no error in the judgment of the court in overruling the exception to the petition.
Did the court err in admitting as evidence the patent to Jones and Hall, under which the land in controversy is claimed by the defendant?
In answering this question, we shall necessarily dispose of the questions of law embraced In the charges ashed by the plaintiff and refused by the court.
It may facilitate our inquiries on this subject to determine, first, what are or were the rights of the holders of the Bryan scrip.
This scrip was issued under authority of a joint resolution of Congress approved December G, 1S3G. (Ilart. Dig., 1776.) The first section of the resolution provides that the Secretary of the Treasury, under the direction of the President, should pay, out of the first available means, the debts of the Government due William Bryan, and those for which he was in any way responsible.
The second section reads as follow's : “He it further resolved, That the President be and is hereby authorized to place in the hands of said William Bryan, and authorize him to sell, a sufficient quantity of land scrip to pay all demands named in the foregoing resolution, and that he instruct him to apply the proceeds of the sale of said scrip to that special purpose : Provided, That said scrip shall not be sold at a less price than fifty cents per acre, and that the said Bryan be required to file in the office of the Secretary of the Treasury proper vouchers for all said debts.”
The scrip was issued by Sam Houston, President, on the 10th of December, 183G; to it were attached certain articles and conditions; but we must look to the law to determine the rights acquired under the scrip. Any conditions, privileges, or restrictions not authorized bj' the law are absolute nullities, and cannot operate to enlarge or abridge the rights of Bryan or those purchasing of him. Tlie scrip issued under and by virtue of the joint resolution gave the holder a claim upon the public domain out of which his demand should be satisfied at the time and in the manner prescribed or to be prescribed by law. This scrip had no preference over any other scrip; the holder of it had no claim to any particular portion of the public lands, but a general lien upon all the lands, to be satisfied out of such portions as were unappropriated at the time he made his selection or location.
It has been urged by the learned counsel of the appellee, (and many cogent arguments have been used,) that the law or joint resolution of December G, 183G, was a-contract between the Government and Bryan, by which (ho latter had a vested interest from that date, and that the Government could not, without a violation of the contract, dispose of any lands then vacant until his claim was satisfied. This position was, however, so far qualified as to admit that the Government might sell any portion of her public lands as her exigencies demanded, but that she could not withdraw any portion, so as to exempt it from location by the holders of scrip.
That she had the right to dispose of her lands as she saw proper, giving to subsequent purchasers the privilege of selecting their lauds out of the whole unappropriated domain, we think admits of no question. To assert the contrary would be saying that the holder of the first certificate for land ever issued had a preferred right, and that the holder of a certificate subsequently issued could make no selection until the first had been satisfied; and that the former could suspend rights subsequently acquired at his pleasure. We are unable to see any distinction between the right of the Government to sell her lands and the right of appropriating them to a particular purpose, or reserving them en *50 tirely from location. And so long as she has left sufficient to satisfy her creditors, they cannot complain of such reservation; no rights possessed by them have been infringed.
In the case of West River Bridge Company v. Dis: et al., (G How. U. S.R., G31,) Justice Daniel, delivering the opinion of the court, says: ‘'No State, it is declared, shall pass a law impairing the obligation of contracts; yet, with this concession constantly yielded, it cannot bo justly disputed that in every political sovereign community there inheres necessarily tlx; right and the duty of guarding its own existence, and of protecting and promoting the interests and welfare of the community at large. This power and this duty are to be exerted not only in the highest acts of sovereignty and in the external relations of Government; they reach and comprehend likewise the interior polity and relations of social life, which should be regulated witli reference to the advantage of the whole society. This power, denominated the eminent domain of tlie States, is, as its name imports, paramount to all private rights vested under the Government; and these last are, by necessary implication, held in subordination to this power, aud must yield in every instance to its proper exercise.
“Under every established Government tlie tenure of property is derived, mediately or immediately, from the sovereign power of the political body organized in such mode, or exerted in such way as the community may have thought proper to ordain. It can rest on no other foundation; can have no other
guarantee. It is owing to these characteristics only, in the original nature" of tenure, that appeals can be made to the laws, either for the protection or assertion of the rights of property. Upon any other hypothesis, the law of propert3r would be simply the law of force. Now, it is undeniable that the investment of property in the citizen, by the Government, whether made for a pecuniary consideration or founded on conditions of civil or political duty, is a contract between the State, or the Government acting as its agent, and tlie grantee; and both the parties are bound in good faith to fulfill it. But into all contracts, whether made between States and individuals or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the pre-existing and higher authority of the. laws of nature, of nations, or of the community to which the parties belong; they are always presumed and must be presumed to be known and recognized hjr all, are binding upon all, and need never, therefore, be carried into express stipulation, for this can add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount.,* wherever a necessity for (heir execution shall occur. Such a condition is tlie light of eminent domain. This right does not operate to impair tlie contract affected by it, hut recognizes its obligation in the fullest extent, claiming only the fulfillment of an essential and inseparable condition.” The reservation of tlie public lands, or the resumption or qualification of an investiture, cannot, in any sense, bo regarded as a violation of a contract, like tlie one under consideration, by the Government. The contract was made in subordination to the inherent and paramount right of eminent domain residing in the Government. This condition is as biuding as if expressed in the contract in literal terms.
The scrip, bounty warrants, or land certificates issued under the various laws entitle the holder thereof to lands to be selected in the manner prescribed by law; and the manner of making such selections may he changed from time to time. The Legislature may prescribe tlie mode in which the surveys shall be made, may designate wliat portions of the country shall he subject to location. These are laws affecting tlie remedy and not tlie right which the Congress of the Republic and of the State has always assumed the right to enact, and no one. has efer denied their constitutionality.
*51 The contract (and it is only a quasi contract) between the Government and the holder of scrip is, that the latter may select such portion of the public lauds as are unappropriated and subject to location, when the same is made, for which a final title shall be issued by the former. These conditions are inherent and paramount, growing out of the right of eminent domain, are known and recognized by all, and need not be carried into the express terms of the contract.
When the Bryan scrip was issued, no portion of the public domain was subject to location. The land office had been closed, the whole land system suspended by the Constitution, and all surveys thereafter made declared to be invalid. (Const., Gen. Pro., sec. 10, Hart. Dig., p. 40.)
The General Land Office was established by the act of December 22, 1836. (Hart. Dig., art. 17S2.) By the 23d section of the act (art. 1804) the office was to open on the 1st of June thereafter, for the benefit of the preferred class only, which was composed of citizens who were here on the day of the Declaration of Independence, and of volunteer soldiers who had served a tour of duty.
By the act of June 12,1S37, (Hart. Dig., art. 1814,) the entire operations of tlie land office were suspended until October following, by the joint resolution of September 30, until the further action of Congress. And by the act of December 14, 1837, (Hart. Dig., art. 1873,) they were suspended until the 1st day of February, 1838, at which date the land office, for the first time since the organization of the Government, went into operation, and then only for the exclusive benefit of the preferred class. It was not open for all until the first Tuesday of August, six months thereafter. Until that period, the holders of the Bryan scrip, as well as all other holders of laud scrip, were precluded from making any selections of land.
But, admitting the doctrine contended for by the appellee, the holders of the Bryan scrip could not disregard the locations made by the preferred class, for whoso benefit the land office liad been open during six months; because, when the Bryan scrip was issued none of those locations had been made, and its holders could contend that their contract was made with reference to the very lauds tlms selected. The opportunity of making locations was first given by that law, and the selections then made must have been in accordance with its provisions, out of the unappropriated or vacant domain, as defined by the laws in force.
To ascertain the rights of Bryan, we must look, then, to the laws in force at the date of his location; as, until then, he had no vested interest in any particular portion of the public domain.
The time of the location does not appear in evidence; and, for the present inquiry, we must lie governed by the date of the patent, which is the 28th day of November, 1S40, or we may look to the period (August, 1838) when he was first authorized to locate his scrip. The question now arises, whether the lands on the island of Galveston, being the lands conveyed by the patent, were subject to location at that date. The first legislation upon this subject is the joint resolution of December 10, 1S36, (Hart. Dig., art. 1770,) authorizing the President to negotiate a loan for twenty thousand dollars.
The first resolution authorizes the President to borrow twenty thousand dollars, for the purpose of purchasing munitions of war.
The second resolution authorizes the President to sell land scrip to raise the said sum of money, provided that no lands shall be sold for less than fifty cents per acre.
The third resolution reads: “And be it further resolved, That all islands belonging to tins Republic shall be, and are hereby, reserved for the Government use, except the President be authorized specially by Congress to sell them.”
An act approved June 8,1837, entitled “An act for the relief of James Erwin and others,” (Hart. Dig., art. 1810,) the object of which was to discharge a debt contracted by the Government, by the sale of land scrip, contains the fol *52 lowing proviso: “Provided, That no lands granted by this Government shall be located on salt springs, gold or silver, copper or lead, or other minerals, or any island oí the Republic.” (Hart. Dig., art. 1811.)
An act to dispose of Galveston and other islands of the Republic of Texas, approved June 12 of the same year, (Hart. Dig., art. 1829,) requires the Secretary of the Treasury to cause the island of Galveston, except the league and labor sold to M. B.' Menard and his associates, and all other islands within this Republic, to be surveyed in lots not less than ten nor exceeding forty acres; and to cause the same to be sold at auction, to the highest bidder, for specie or the notes of current and specie-paying banks, one-fourth of the purchase-mouey to be paid down and the balance in equal installments at three, six, and nine months. The’ second section of the act authorized aliens to purchase ; and the third section enacts that purchasers, failing to pay the installments as they become due, shall forfeit the sums previously paid, and the lots and lands purchased by such defaulters shall revert to the Government of this Republic.
By the acts and resolutions above cited the intention of the Government is clearly shown to reserve all islands from location. The public domain was the principal source of revenue possessed 'by the Government. Upon that, as a pledge, she had borrowed large sums of money, specially reserving the islands for her own use, either because lliey were more valuable or more available than other portions of the public domain.
Congress, having declared that (he islands should not be sold unless express authority was given for that purpose, at a subsequent day directed a sale of them in a particular way. The manner in which the sale was to be made was such as to derive the greatest possible amount of revenue from the islands. The islands, as well as other portions of the public domain, were rendered available to meet the exigencies of the Government.
The right of the Government to dispose of her lands as she thought proper cannot be questioned. She liad the. authority and right to reserve the islands or any other portion of tiie public lands from indiscriminate location. That right she exercised as to tiie islands; they could be acquired by citizens only in the way prescribed by the law so reserving .them.
It is urged by the appellee that the laws reserving’ islands from location were not, at the date of the patent, in force; and for the law by which they are repealed we are referred to tiie 39th section of the land law of December 14, 1837, (Hart. Dig., art. 1875,) the latter clause of which reads as follows: “And all laws heretofore enacted on the subject of public lands shall be, and they are hereby, repealed.”
This clause is broad and unqualified in its terms, and, unless its literal meaning is restricted by the application of the known rules of construction, its effect is clear. The literal meaning is not always to be attached to the expressions made use of in a law. “If the literal expressions of a law would lead to absurd, unjust, or inconvenient consequences, such a construction should be given as to avoid such consequences, if, from the whole purview of the law and giving effect to the words used, it may fairly be done.” (Bao. Abr., vol. 9, p. 240; Fisher v. Blight, 2 Or. R., 386.)
What are the effects of giving to the expressions used in this law a literal construction? Are the consequences absurd, unjust, or inconvenient? To determine this, let ns ascertain what laws are repealed, if all laws previously enacted upon the subject of public lands are embraced in this law.
The following are laws relating to public lands, and, if the expression used in tiie law receives its strict and litoral meaning, are embraced within it:
The ordinance and decree of November 24, 1S35, granting six hundred and forty acres of land to the officers and privates of the regular army of Texas; the ordinance of December 5,1835, giving to volunteers disabled in the service, and in case of their death to their heirs, a bounty of six hundred and *53 forty acres of land; tlie ordinance of December 11, 1835; of December 14, 1835; tlie joint resolution of November 24,1S3G; the act of December 5,1830; the act of December 10, 1830, (I-Iart. Dig'., arts. 1709, 1771, 1772, 1774. 1775.) providing for the issuance of bounty warrants to those who have fought tlie battles of tlie country, and to tlieir heirs and legal representatives in case of their death.
No other laws are found upon the statute book providing- for the reward of that meritorious class. If the laws above cited are repealed, then the volunteer soldiers, who served tile country in its darkest hour, who fought her battles aud won her independence, are alone unprovided for in the distribution of public lauds so liberally made by the Government. The class which the Government designed most to favor, for whose exclusive benefit the land office was to be opened for six months, have, in fact, no rights; for tlie very law which established tlie land office and first authorized them to make locations, abrogated the laws, heretofore enacted, by which provision liad been made for them ; and unless they had previously received their warrants, their meritorious services have never been requited. They are provided for by no subsequent law.
The joint resolution of December 0, 1830, was also repealed, and scrip issued after that date to William Bryan (if any such was issued) was without authority of law.
May we not, from the whole purview of tiie law, and giving effect to the words used, fairly give it a construction by which these unjust and inconvenient consequences may be avoided ?
“ When a law is plain and unambiguous, whether it he expressed in general or limited terms, the Legislature should be intended to mean what they have plaiuly expressed; and consequently no room is left for construction. But if from a view of the whole law, or from other laws in pari materia, the evident intention is different from the literal import of the terms employed to express it in a particular part of the law, that intention should prevail, for that, in fact, is the will of the Legislature.” (9 Bac. Ahr., 240; United States v. Fisher, 2 Cr. R., 336, 397.)
In tlie ease of Pennington v. Coxe, (2 Cr. R., 33, 1 Cond., 346,) it is said, “That a law is the best expositor of itself; that every part of an act is to be. taken into view for the. purpose of discovering the mind of the Legislature; and that the details of one part may contain regulations, restricting the extent of general expressions used in auother part of the same act.”
Let us apply those rules to the exposition of the law under consideration.
The object of the act is fully expressed in its title, it being “An act to reduce into one act and to amend the several acts relating to the establishment of a General Land Office.” All of the details of the act relate to that one subject; the whole context of the law demonstrates that the Legislature had iu view that single object; and, if it were necessary, we might call in some implication to aid that intent. (6 Cr. R., 307, 314.)
There were scattered through the statute book various enactments concerning a “General Land Officethese several acts were reduced into one act and amended by the act of December 12,1837. The object of this law was to perfect the land system of the Republic, to regulate the mode of distributing to legal claimants the lands to which they were entitled under the existing laws.
Tlie general expressions used in the law must he limited in their application to tlie object had in view by tlie Legislature. “A thing which is within the intention of the makers of a statute is as much within the statute as if it were within tlie letter; ” “and a tiling which is within theletterof the statute is not within tlie statute unless it he within the intention of tlie makers.” (9 Bac. Abr., 247.) Prom tlie context of the statute, we could uot infer that it was within tlie intention of tlie Legislature to alter or repeal any laws except such as relate to the subject-matter of the statute.
When it is manifestly the intention of the Legislature, says Bacon, *54 (vol. 9, p. 247.) “that a subsequent act of Parliament shall not control the provisions of a former act, tlie subsequent act shall not have such operation, even though the words of it, taken strictly and grammatically, would repeal the former act.” “A Legislative act is to be interpreted according to tiie intention of the Legislature, apparent upon its face. Every technical rule, as to tlie construction or force of particular terms, must yield to the clear expression of tlie paramount will of the Legislature.” (Wilkinson v. Leland. 2 Pet. It., 6(12.)
Looking at the whole act., we have no difficulty in arriving at the intention of the Legislature — that it was simply to reduce into one act and to amend the several acts relating to the establishment of a General Land Office. This is tlie object of the act, as declared by its title and clearly indicated in its details.
It does not pretend to make provision for the soldiers of tiie Revolution, in • whose favor laws had been previously enacted; it does not provide for the issuance of bounty-warrants in any ease; it does not contain any section defining tlie public domain. These laws of various dates are not embraced within tlie purview or the details of the present statute. It was manifestly the intention of the Legislature to leave them in force; and a technical or strict construction of particular terms must yield to the clear expression of the paramount will of the Legislature.
Considering together the former laws and the present, the object had in view, we are of opinion that it was not the intention of the Congress to repeal any but such laws as were embraced within the purview of the act, and that tiie laws reserving islands from sale are still in force.
We are supported in our conclusions by the subsequent legislation on the same subject. By the act of January 20, 1840, (Hart. Dig., art. 127,) adopting the common law and repealing all former laws, the laws of the former Government reserving islands, etc., were especially continued in force.
And, although no such laws are known to exist, the exception indicates the belief of tlie Congress that islands at that time were not subject to location, and its intention to continue such laws in force.
The joint resolution of 1S48, under which the present action was instituted by tlie attorney general, also shows the intention of the Government to assert its exclusive title to the islands, unless disposed of in accordance with law. By no rule of construction can the repealing clause of this statute be applied to the laws reserving the islands from sale.
Those laws were, in fact, a special appropriation of tlie islands for the use of the Government, and they were from that moment severed from the public domain.
In the case of Wilcox v. Jackson, ex dem. HcConnel, (13 Pet. R., 498,) similar In many of its features to the present, it is said that an “ appropriation of land by tlie Government is nothing more nor less that setting it apart for some particular use; and whenever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public domain; and no subsequent law, or proclamation or sale, would be construed to embrace it or to operate upon it, although no other reservation were made of it.”
The island of Galveston having- been reserved from location and sale, unless special authority for that purpose was given by Congress, was, from that moment, severed from the public domain; no general repealing clause contained in subsequent laws can be held to apply to the act appropriating it to a particular purpose.
Having lost the character of “public lands,” it could not regain that character except by direct and express terms. We are therefore of opinion that the court erred in permitting the patent to Jones and Hall to he mid in evidence ; the patent being- for lands not subject to appropriation by individuals by location. is absolutely null and void.
The patent was issued, not only without authority of law, but in express violation of law.
Note 15. — Kimmell u. Wheeler, 22 T., 77.
' Note 16. — Cain v. The State, 20 T., 355.
Note 17. — Tabor v. Commissioner, 29 T., 508.
Note 18. — Franklin v. Kesler, 25 T., 138; Sherwood v. Fleming, 25 T. Supp., 408.
“ The issuing of ¡1 patent is a ministerial act, and must be performed according to law; if it is issued against law. it, is void, (2 How. R., 318,) and those claiming under it acquire no right.” (7 Pet. R., 222; 3 Coke R., 94; 1 Tex. R., 721.)
Tile instructions giveu'to the jury at the request of the defendant are correct, as abstract principles, but they were inapplicable to the case at bar, and should llave been refused.
This was a direct proceeding on the part of the Government against the claimant of the laud; the patent was called directly in question; the grounds of its invalidity were apparent upon its face, and it was the duty'of the court to instruct the jury as to its legal effect.
It is ordered, adjudged, and decreed that the judgment of the court be reversed and tiie cause remanded for further proceedings.
Judgment reversed.

The right of appropriating and reserving the public domain has been frequently exercised by the Government of tlie United;Stqtes,and qf the several States, and has rarely if ever been questioned.