**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**1,078.27 ACRES OF LAND, MORE OR
LESS, SITUATED IN GALVESTON
COUNTY, TEXAS and Galveston City
Company, et al., Defendants-Appellants.**

**No. 29912.**

United States Court of Appeals,
Fifth Circuit.

July 6, 1971.

Rehearing and Rehearing En Banc
Denied Sept. 16, 1971.

Preston Shirley, Mills, Shirley, Mc-Micken & Eckel, Galveston, Tex., for defendants-appellants.

Anthony J. P. Farris, U. S. Atty., Houston, Tex., Dirk D. Snel, Atty., Shiro Kashiwa, Asst. Atty. Gen., George R. Hyde, Atty., Appellate Section, Dept. of Justice, Washington, D. C., William L. Bowers, Jr., Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before WISDOM, THORNBERRY and DYER, Circuit Judges.

DYER, Circuit Judge:

"Facts relevant to this title dispute have been developing since Jean Lafitte was appointed Governor of Galveston Island in 1819 by the Republic of Mexico."[1] One hundred and forty years later, in 1959, the United States brought suit to remove cloud and, in the alternative, to condemn whatever interest defendant City Company[2] might have in 1,078.27 acres of land situated on the east end of Galveston Island.[3] The con-

---

1. United States v. 1,078.27 Acres of Land, Civil Action No. 2662, S.D.Tex. Jan. 23, 1970. The almost legendary political, military and historical events which frame the issues in this case were developed in almost nineteen hundred pages of testimony and one hundred and seventy-eight exhibits. Judge Noel's two hundred and fifty-seven page opinion recites the underlying facts in detail, probes and determines many issues that either are not raised on this appeal or are not, in our view, necessary for our disposition of the case.

2. For convenience all appellants will be collectively referred to as City Company,

through whom they claim. They are: First Hutchings-Sealy National Bank, Liquidating Trustee for Galveston City Company and the Stockholders; Galveston City Company; and Hill's Fish & Oyster Company, a partnership composed of Frank M. Hill, Smith M. Hill and C. R. Hill.

3. The land in question is described as follows:

NORTH PART OF FORT
SAN JACINTO, TEXAS
In Galveston County, Texas, being the entire northerly end of Galveston

demnation proceeding was severed from the trial, pending the outcome of the title issue. The District Court found that the United States already held title to the property at the time suit was brought and since no defendant had any compensable interest in the property, it was unnecessary to determine the issue of just compensation. We affirm.

On January 17, 1833, the Mexican State of Coahuila and Texas conceded to Juan N. Seguin one league of land which included the entire east end of Galveston Island. On July 30, 1834, title to one league was issued to Michael B. Menard as attorney-in-fact for Seguin. Immediately thereafter Menard transferred the title to himself and nine associates.

After Texas declared its independence from Mexico, Menard, as assignee of Seguin, petitioned the Congress of the Republic of Texas to confirm his title because it was subject to doubt. On December 19, 1836, the Congress, by "An Act Relinquishing One League and labor of land on the east end of Galveston Island to Michael B. Menard and Associates," relinquished the land but reserved to itself in section 5, a tract of land containing fifteen acres more or less. The "reserved" land is the heart of this litigation.

On January 28, 1838, the Republic of Texas issued to Menard and his associates a patent for a league and labor of land which included the east end of Galveston Island, but excepted "the reservations expressed in the fifth section of the Act of Congress aforesaid." In January 1842 and June 1843, Menard deeded the land to the City Company by reference to the Seguin Grant and the Menard Patent.

A treaty of annexation was entered into between the United States and the Republic of Texas on June 23, 1845. On December 29, 1845, President Polk signed the joint resolution of Congress making Texas a state of the United States, the

Island northeast of the City of Galveston;

Beginning at a point marked by a drift bolt in the center of Galveston South Jetty at engineer station 69/02.6. Said point point [sic] being also located S 35° 27' 35" W 3,179.3 feet from the Fort Point Lighthouse (abandoned);

Thence N 82° 00' W 625.0 feet to a point on the Easterly harbor Line of Galveston Channel, as established by the United States;

Thence northerly along said Harbor Line, including all accretions and all tidelands, westerly of the said Harbor Line and contiguous thereto, to the intersection with a line parallel with and 100.0 feet westerly from the centerline of Galveston South Jetty;

Thence northeasterly and easterly along said parallel line with centerline of South Jetty and 100.0 feet therefrom, to the low water mark of the Gulf of Mexico, including all accretions and tidelands northerly of said parallel line;

Thence southerly at right angle to the centerline of South Jetty 200.0 feet to point on the low water mark of Gulf of Mexico;

Thence southerly and southwesterly along the said low water mark of Gulf to a point which is located S 82° 00' E from aforementioned drift bolt, including all accretions and tidelands;

Thence N 82° 00' W along the south line of this tract to place of beginning, containing 1082.00 acres, more or less;

LESS AND EXCEPT the following parcels:

Parcel A: Beginning at the southwest corner of site from which mark "B" a brass plug set in cap rock on South Jetty bears N 80° 51' W 27.1 feet; and running thence N° 04' E, 300 feet parallel to and 25 feet distant from the centerline of said South Jetty, to the northwest corner of site; thence S 80° 51' E 413.6 feet, to the northeast corner of site; thence S 09° 00' W 278.3 feet, to the southeast corner of site; thence N 80° 51' W 525.6 feet, to the point of beginning, the tract containing an area of 3 acres, more or less.

Parcel B: Beginning at a point on the southerly line of the hereinbefore described Parcel A (course numbered 4) from which the southwest corner of same bears N 80° 51' W 209.36 feet; and running thence S 80° 51' E 50 feet, along the southerly line of Parcel A; thence S 09° 09' W 635.84 feet, to point in the northerly line of the highway to Ferry; thence N 80° 51' W 50 feet, along said northerly line; thence N 09° 09' E 635.84 feet, to the point of beginning, this tract containing an area of 0.73 acre, more or less, leaving a balance of 1078.27 acres, more or less.

terms of which included a cessation to the United States of "all barracks, * * * ports and harbors, docks, magazines * * * fortifications, and all other property and means pertaining to the public defense."

The hurricanes of 1837 and 1875 resulted in substantial erosion and alteration of the low lying eastern end of Galveston Island, including the "Reserve." As a consequence, the City of Galveston and the United States became concerned. They constructed a pier and jetty system which not only arrested the erosion, but caused accretion to commence.

In 1890 the land in question was surveyed by government engineers, under the supervision of Major O. H. Ernst, to relocate the south boundary of the Reserve. It was then marked with cedar posts in the ground, and thereafter a fence along the boundary was erected. In 1898, before proceeding with fortification of the strategic east end of the Island, the Government requested a quitclaim deed to the Reserve from the City Company. On March 17, 1898, the City Company deeded to the United States all land north of the Ernst line on the east end of Galveston Island upon condition

> that the said property is to be used by the United States of America for fortifications, military or naval posts, and other public purposes of the U.S. Government, only, and if at any time it be abandoned for the purposes aforesaid, or the said property is used for any private purposes whatsoever, then in such, or any or either event, the title to said property hereby conveyed shall immediately revert to and vest in the said. Galveston City Company, its successors or assigns.

After years of consideration by various federal officials—including the Chief of Engineers, the Secretary of War, and the Attorney General—the deed was fi-

nally accepted and recorded on August 10, 1910.

The Government used the land as a military fort until 1947. On January 19, 1959, the land was officially transferred to "civil account" from "military account." Since 1947 the City Company has asserted title under the conditions in the 1898 deed and has demanded possession. It has also relied on the Seguin Grant and Concession. The Government, on the other hand, has asserted that it obtained title to the land from the State of Texas in 1845 by virtue of the Articles of Annexation; disputes the validity of the Seguin Grant and Concession; has denied the efficacy of the 1898 deed from the City Company to the United States; and has contended that any claim by the City Company to compensation for the land is barred by the six year jurisdictional limitation of the Tucker Act, 28 U.S.C.A. § 2501.

Preliminarily we find it unnecessary to concern ourselves, as did the District Court, with the question of burden of proof. Assuming the Government had the burden, we entertain no doubt that by convincing evidence it identified and proved title to the land claimed.

Another threshold question posed by the City Company is whether the judgment is fatally infected by the trial court reopening of the case fifteen months after submission and his bringing to the attention of counsel the independent research which he conducted in the meantime. After referring to a 1924 Master's thesis, prepared by a graduate student at the University of Texas, entitled "A History of the City of Galveston to 1865," the trial judge invited counsel for both parties to submit such other evidence as they might desire. Subsequently the Government introduced six exhibits, but not the thesis. The City Company objected to the reopening of the case and the offer of any more evidence.[4]

4. In his opinion the trial judge stated: "It is manifest from even a brief statement of the background of this case that many of the issues turn on political, military, historical and natural events and

facts which would have been of general public knowledge at the time of their occurrence. Where the record has been found unsatisfactory as to pertinent events and facts of this kind, they have

■ Manifestly the trial judge felt that the record was, at least in some respects, incomplete. While it is unusual for a trial judge to engage in independent research, particularly with the kinetic energy here shown, we find, for the reasons which follow, that this does not require reversal.

■ First, the trial judge explicitly stated that his research was utilized only when the results could appropriately be judicially noticed. He did not specify what material he found appropriate, but a close reading of the record convincingly indicates that he was concerned with and took judicial notice of legislative, political, and human events of historical antiquity, *circa* 1833 to 1845, to determine the existence *vel non* of fortifications on the land in question at that time. Documents of this era were properly the subject of judicial notice. *See* Dallas County v. Commercial Union Assurance Co., 5 Cir. 1961, 286 F.2d 388, 396–397; Wickes, Ancient Documents and Hearsay, 8 Tex.L.Rev. 451 (1930).

■ Second, in this bench trial we are entitled to rely upon the experienced trial judge to separate the wheat from the chaff and thus consider only such matters as he might properly judicially notice. *See* Baumel v. Travelers Insurance Co., 2 Cir. 1960, 279 F.2d 780, 783; Builders Steel Co. v. C. I. R., 8 Cir. 1950, 179 F.2d 377, 379; McComb v. McCormack, 5 Cir. 1947, 159 F.2d 219, 227. *See also* Cowlitz Tribe of Indians v. City of Tacoma, 9 Cir. 1957, 253 F.2d 625, cert. denied, 1958, 355 U.S. 955, 78 S.Ct. 541, 2 L.Ed.2d 531; Smyth v. New Orleans Canal and Banking Co., 5 Cir. 1899, 93 F. 899. While it is true that the court referred to and read to counsel excerpts from the Master's thesis, which was in-

admissible hearsay and not a subject of judicial notice, he clearly stated: "The basic information is contained in Morgan's papers which are a very famous collection in the Rosenberg Library and the original papers are there. * * *" [5] The court thereupon reopened the hearing and invited counsel to offer further testimony. The Government accepted the invitation and offered the Morgan papers, which were received as ancient documents.

■ Third, City Company's objection to the court's reopening the case for further evidence gives us little pause. In a non-jury trial the court may exercise wide discretion in permitting evidence to be offered after both parties have rested. Arthur Murray, Inc. v. Oliver, 8 Cir. 1966, 364 F.2d 28, 34; *see* Pehrson v. C. B. Lauch Construction Co., 9 Cir. 1956, 237 F.2d 269, 271–272; Chemical Delinting Co. v. Jackson, 5 Cir. 1951, 193 F.2d 123, 127. Where, as here, the court has itself discovered relevant evidence tending to establish the truth of a 150-year-old fact, justice would indeed be blind if that evidence could not be introduced at a reopened hearing.

■ Finally, we have painstakingly reviewed the record and the exhibits and have found direct support for our determination of the issues which we find necessary to consider and decide on this appeal. Thus, if there was any error in that the District Court "inappropriately" took judicial notice of some matters turned up in its research, we conclude the error was harmless. Fed.R. Civ.P. 61; *see* Builders Steel Co. v. CIR, 179 F.2d *supra* at 379; McComb v. McCormack, 159 F.2d *supra* at 227.

We turn now to the sole issue confronting us: which party, if either, had

---

been researched. Such research was conducted at the Rosenberg Library, Galveston, Texas; the Houston Public Library; the Archives Division of the Texas State Library; files of the Galveston Daily News and Galveston Tribune; Federal Records Center; Barker Texas History Library; University of Texas Library; and the Anthropology Library of the Texas Archeological Research Center

of the Department of Anthropology of the University of Texas. *When appropriate, the results of such research have been judicially noticed.*" (emphasis added.) The source materials consulted by the court are fully set forth in his opinion.

5. United States v. 1,078.27 Acres of Land, Civil Action No. 2662, S.D.Tex., Jan. 23, 1970.

fee simple title to the land in question on November 21, 1959, the date the Government filed the original complaint. This simply stated proposition spawned a multitude of complex legal issues that faced the District Court. The court's exhaustive and comprehensive opinion makes it unnecessary to delve into many of the contentions elucidated at trial. Accordingly, we narrow our inquiry to the bases upon which the City Company and the Government rely to establish their respective claims of title, and the legal effect, if any, of the reservation contained in the 1898 deed from the City Company to the Government.

*The City Company's Title*

The City Company urges that the concession of January 17, 1833, and the grant of July 30, 1834, from the State of Coahuila and Texas to Seguin, which included all of of the east end of Galveston Island without exception, were valid. Without so much as a nod at the Mexican national law concerning the prerequisites for obtaining a valid title at that time, the City Company rests its argument on the proposition that the grant presumptively complied with then existing law. Smith v. Temple Lumber Co., Tex.Civ. App. 1959, 323 S.W.2d 172, 177.

If, and the if is a big one, we were to accept the City Company's argument that the grant is presumptively valid, the presumption disappears upon proof that the grant was void. The District Court so found, and we agree. Without belaboring the point so thoroughly developed in the District Court's opinion, it is clear that neither Seguin nor Menard obtained the necessary approval of the Supreme Executive of the United Mexican States which

was required in 1832 [6] for the granting of land located, as is this land, within ten littoral leagues of the seacoast. The fact that by the time title was issued to Menard, as attorney-in-fact, in July 1834, the laws *governing disposal of vacant lands* had been suspended is of no moment. If the *alcalde* (mayor) of the Town of Liberty, Mexico, had any authority to issue title to this property to Menard, it could only have been pursuant to the 1832 law.[7] But "grants made by the State under the earlier laws of 1825 and 1832 were void unless the prior approbation of the federal executive was obtained and proven." State v. Balli, 1944, 144 Tex. 195, 190 S.W.2d 71, 94, cert. denied, 1946, 328 U.S. 852, 66 S.Ct. 1341, 90 L.Ed. 1624; Republic of Texas v. Thorn, 1848, 3 Tex. 499, 510; see Wilcox v. Chambers, 1862, 26 Tex. 180, 187–188.

Next the City Company argues that the 1836 Act of Relinquishment, passed by the Congress of the Republic of Texas at Menard's behest, and the patent issued to him conveyed to him title to all of the east end of Galveston Island, irrespective of a reservation contained in section 5 of the Act and, by reference, likewise included in the patent. The reservation in the Act stated:

All that tract of land from the extreme east end of the Island of Galveston running west on the north side of the Island until it strikes a bayou, a short distance above the present fort, thence up said bayou to its source, thence in a straight line across the Island to the Gulf, containing fifteen acres more or less. * * *

In 1838, acting under the authority granted by the Act, the President of the Republic of Texas signed a patent grant-

---

6. Article 4 of the General Law of Colonization, Decree No. 72, August 18, 1824, 1 Laws of Texas 95, 97, provided: "No lands lying within 20 leagues of the boundaries of any foreign nation, nor within 10 leagues of the coast, can be occupied by settlors without the previous approbation of the Supreme Executive Power."
By Article 25 of Decree No. 190, April 28, 1832, 1 Laws of Texas 299, 303, the Congress of the State provided: "The Executive shall take care that, within * * ten littoral leagues upon the coast of the Gulf of Mexico, no settlements are made that are not composed of two-third Mexicans, previously obtaining by request the approval of the National Executive, to whom he shall forward all petitions made on the subject. * * * "

7. *See* note 6 *supra*.

ing to Menard by quitclaim deed the Republic's title to the land relinquished, excepting "the reservations expressed in the fifth section of the Act of Congress aforesaid."

The City Company was formally organized in 1838 and incorporated in 1841. By deeds dated January 1, 1842, and June 1, 1843, respectively, Menard conveyed the land to it by reference to the Seguin grant and the Menard patent. The City Company urges that the reservation is void for indefiniteness and therefore the title to the Reserve passed to Menard. It contends that there is no way to fit the Moreland and the Borden field notes—the only known sets of field notes made prior to December 9, 1836— to the reservation, and further, that there is no way to apply the description of the reservation to the Groesbeck survey of 1838. Finally, it is said that the reservation cannot be placed on the ground because there is no starting point that is identifiable, and that the calls cannot be identified either in distance, direction, or fact. Citing Norris v. Hunt, 1879, 51 Tex. 609, 614, City Company submits that:

> The true rule, as deduced from the authorities, seems to be that this description should be so definite and certain upon the face of the instrument itself, or by other writing referred to, that the land can be identified with reasonable certainty.

*See also* Mankey v. Adams, 5 Cir. 1927, 18 F.2d 60; Matney v. Odom, 1948, 147 Tex. 26, 210 S.W.2d 980; Smith v. Griffin, 1938, 131 Tex. 509, 116 S.W.2d 1064; Higgins v. Bankers Mortgage Co., Tex. Comm. App. 1929, 13 S.W.2d 683.

■ We agree with the District Court that the principles relied upon by the City Company are correct as applied to deeds. Matney v. Odom, 210 S.W.2d *supra* at 982. But such principles are inapplicable in determining the construction to be applied to legislative grants, which are always construed strictly in favor of the state. Empire Gas & Fuel Co. v. State, 1932, 121 Tex. 138, 47 S.W. 2d 265, 272. In construing such grants

the courts may not exclude other relevant considerations when, as here, they must grapple with the difficulty of locating land after 140 years of significant changes wrought by hurricane winds and changing tides on what was once an almost barren sand spit.

In 1836 the east end of Galveston Island that was sought to be reserved from the Menard grant was a peninsula surrounded on three sides by water. Thus the only confusion concerning the boundary of the reservation was necessarily related to the location of the south line. The District Court put it: "If the South boundary could have been located on December 9, 1836, the date of the Act, then the reservation was described with reasonable certainty."

■ The grant and the exception describing the Reserve must be "interpreted according to the intention of the Legislature, apparent upon its face. Every technical rule, as to the construction or force of particular terms, must yield to the clear expression of the paramount will of the Legislature." State v. Delesdenier, 1851, 7 Tex. 76, 107. The City Company urged an extension of this rule of construction in City of Galveston v. Menard, 1859, 23 Tex. 349, where Menard was contending that the grant to him to the west of the Reserve, under the 1836 Act, extended to the edge of the harbor channel in the Bay. The court accepted this argument, saying:

> By the strict letter of the legislative grant, Menard's right of property did not extend to the channel. It is extended there, only by resort to the plain intention of the contracting parties.

*Id.* at 404. *See also* Empire Gas & Fuel Co. v. State, *supra*. Thus where the instrument itself does not fully disclose the intention of the legislature, a court may consider extrinsic facts such as history, subject matter involved, and the end sought to be obtained. Magnolia Petroleum Co. v. Walker, 1935, 125 Tex. 430, 83 S.W.2d 929, cert. denied 296 U.S. 623, 56 S.Ct. 144, 80 L.Ed. 442.

In concluding that the description in section 5 of the Act was sufficient to ascertain the south boundary line, the District Court properly relied in part on the fact that the Congress and Menard had the two surveys of the east end of Galveston made by I. N. Moreland in 1834 and by John P. Borden in 1835. In this connection the court in *Menard* said:

> These provisions show unquestionably, that negotiations had transpired between the government and Menard, for the building of a town upon the island of Galveston, which would be a port of entry; and that the subject was practically surveyed, and well considered by them.

23 Tex. at 397–398. Menard's counsel persuaded the court to give a practical construction to the Act by arguing that "[t]he legislative Act, in favor of Col. Menard, was to be read, not with the precision of an orthoepist, or the faultfinding astuteness of a lawyer; but according to the plain understanding, the common-sense, the common usage of everyday, practical business men." 23 Tex. at 374.

Furthermore, it is significant that John D. Groesbeck, having been employed by Menard to survey the land acquired under the Act of Relinquishment, completed his survey of the east end of the island in 1838. The hurricane of 1837 was of such severity that it substantially changed the configuration of the east end of the island and destroyed any marker that may have been placed there by Trimble and Lindsay, who in 1837 surveyed the island except for the league of labor and land sold to Menard. Accordingly, Groesbeck necessarily relocated the southern boundary between the Menard patent and the Reserve, as well as the other boundaries of both parcels. Groesbeck succeeded in his endeavor, and thereafter his lithographical map was used for years by the public and the City Company.

Between 1838 and 1888 there were major topographical changes caused by hurricanes, tidal changes, erosion, and accretions. In the latter year, O. H. Ernst surveyed the land for the Government and relocated the boundary line between the Menard Patent and the Reserve on a course and position consistent with that located by Groesbeck. Major C. J. Allen, Major Ernst's successor, relocated the Reserve's south boundary in 1890. The line was marked with cedar posts, and in 1892 a fence was constructed. Allen's boundary was a prolongation of Groesbeck's line east and west. The Groesbeck-Ernst lines were, for all practical purposes, coincident. In these circumstances the District Court properly found that they were the best evidence available for the location of the south boundary of the Reserve. Taylor v. Higgins Oil and Fuel Co., Tex.Civ.App.1928, 2 S.W.2d 288, 300; *see, e. g.*, East Texas Pulp & Paper Co. v. Cox, Tex.Civ.App. 1964, 381 S.W.2d 78. From what we have said it is self-evident that, although a present day surveyor would find it difficult to locate exact points and calls on the ground, this does not impeach the definiteness of the original description. It is manifest that the southern boundary of the Reserve, as defined in section 5 of the Act of Relinquishment, could have been located in 1836 and, in fact, coincides with the line found by Groesbeck and redetermined by Ernst.

Moreover, the southern boundary was recognized by the parties as fixed by the Groesbeck-Ernst line. The City Company recognized the Groesbeck survey and map as accurate and used it in the sale of lots. It is the only line on which the United States and the City Company have relied since 1888. It has been fenced since 1892 and has been continually possessed and improved by the Government since that time. Thus, if there ever was any doubt concerning the location of the boundary line of the Reserve it has been dissipated by the City Company's acquiescence. *See* Gulf Oil Corp. v. Marathon Oil Co., 1941, 137 Tex. 59, 152 S.W.2d 711, 714.

For the reasons explicated at length in the District Court's opinion and those which we have briefly discussed,

we find the description of the reservation contained in section 5 of the Act of Relinquishment sufficiently definite and valid.

The City Company claims further, however, that the Reserve is limited to no more than 4.9 acres or, in the alternative, fifteen acres because the submerged land on the north, east, and west passed to Menard under his patent. Thus the accretions which filled the submerged land belong to the Company as the successor to Menard.

■ Following the 1875 hurricane, approximately thirty-eight acres of upland remained in the reserve. Thus, practically all of the 1,078.77 acres in suit consist of accretions which occurred after the 1875 storm. The record firmly supports the Government's position that all accretions to the land in question were to the upland (a natural deposit of alluvium on the shore causing the mainland to extend outward), and not to the submerged land (deposits which, having created a high point in the sea bottom, build up and toward the older upland, becoming fast land as they meet). Accretions to the upland, as in this case, belong to the owner of the upland. Luttes v. State, 1958, 159 Tex. 500, 324 S.W.2d 167, 187; Giles v. Basore, 1955, 154 Tex. 366, 278 S.W.2d 830, 835–836.

The City Company, nevertheless, contends that it is the owner of the accretions because the description of the land in the Menard patent does call to proceed

> thence eastwardly with the channel of the harbor in the Bay of Galveston and with the general course of said island at the distance of at least one hundred and fifty varas from the shore to a stake one hundred and fifty varas from the extreme eastern point of said island; thence south to the Gulf of Mexico, thence with the meander of the Gulf to the southeast corner of Lot No. One (1) in said plot of survey.

\* \* \*

City Company relies upon this description and the decisions in City of Galveston v. Menard, *supra*; State v. Galveston City Company, 1873, 38 Tex. 12; State v. Lain, 1961, 162 Tex. 549, 349 S.W.2d 579; and State v. Jadwin, Tex.Civ.App.1904, 85 S.W. 490, error dismissed, 209 U.S. 553, 28 S.Ct. 759, 52 L.Ed. 923.

■ In *Menard* accretion was not an issue. The case involved flats located south of the south boundary line of the Reserve. The decision did not purport to determine title to the submerged land surrounding the Reserve. It is noteworthy, however, that the state court in *Menard* construed the Act and patent to conform to the intent of the parties. 23 Tex. at 397, 404–405. By analogy, since it is clear that Congress excepted the Reserve for the public defense, the fortifications located on it would have been wholly ineffective without direct access to the harbor and the channel, or without title to the flats adjacent to the area. The District Court aptly said:

> It was the intention of the Congress that the south line of the Reservation should extend from the Gulf shore to the harbor channel; and, that the Menard patent should not include any land north or east of that line. In other words, it was the intent of the Congress that the quitclaim deed to Menard should include only the submerged land or flats adjacent to the harbor side of the land upon which the city was to be built, namely the land *granted* in the Act of Relinquishment, *but* that the Republic of Texas should retain title to the submerged land or flats adjacent to the Reserve. This is entirely consistent with the reasoning of the Supreme Court of Texas in *Menard*. The intent of the Congress, not the words of the officer who prepared the patent for signature by the President, is controlling.

*See* State v. Delesdenier, *supra*. This is in accord with the generally accepted rule that a grant from the sovereign conveys only that specifically and unequivocally

delineated and nothing more. Empire Gas § Fuel Co., 47 S.W.2d, *supra*, at 272.[8]

Having determined that the City Company obtained no title to the land in question under the Seguin grant and concession or under the patent from the Republic of Texas, we turn to consideration of the Government's title claim.

*The Articles of Annexation*

The United States Congress on March 1, 1845, adopted a joint resolution consenting to annexation of the Republic of Texas upon certain conditions. Pertinent to our consideration was the following:

> Said state, when admitted into the union, after ceding to the United States, all public edifices, fortifications, barracks, ports and harbors, * * * magazines, arms, armaments, and all other property and means pertaining to the public defense belonging to said Republic of Texas, shall retain [certain items such as all vacant and unappropriated lands lying within its limits]. * * *

5 Stat. 797.

The conditions of annexation were accepted by the Congress of Texas on June 23, 1845 (2 Gammel, Laws of Texas 1200, 1225) and its people meeting in convention on July 4, 1845. 2 Gammel, Laws of Texas 1228. On December 29, 1845, the United States Congress passed a joint resolution admitting Texas into the Union. 9 Stat. 108.

The Government contends that title to the Reserve passed to it on December 29, 1845. The City Company denies cession of the Reserve. Thus the pivotal question is to what use was the Reserve being put on the date in question.

██ It would serve no useful purpose to detail the evidence so fully considered

by the District Court concerning use of the Reserve. Suffice it to say that there is substantial evidence to support the lower court's conclusion that on December 29, 1845,

> the fortifications at Galveston had been erected; housing, guns and ammunition had been supplied; personnel had been provided; * * * the fortifications were located on the Reserve near the old fort; * * * they belonged to the Republic of Texas; and, * * * they pertained to the public defense. It is also clear * * * that the entire Reserve, not merely the area immediately around the old fort, was retained by the Republic for military purposes. This dedication for military use had not been limited prior to annexation, rather, the Republic retained the entire Reserve for potential defensive use and actually constructed fortifications there from time to time. Therefore, the entire tract reserved to the Republic by the Act of Relinquishment (as well as all property thereon at the date of annexation), not merely the area immediately around the existing fortifications, passed to the United States under the Articles of Annexation.

*The 1898 Deed from the City Company to the Government*

On March 17, 1898, the City Company executed and delivered to the United States a quitclaim deed conveying the Reserve, *i. e.*, the land north and east of the Groesbeck line of 1838 and relocated by Ernst in 1888. The United States finally accepted the deed on August 3, 1910. The deed contained the following limitation:

> But it is expressly understood and agreed, however, that the above de-

---

8. The submerged land in controversy in *Lain* was located south of the prolongation of the Groesbeck line. There was no adjudication affecting the United States, which was not a party. The issues there tried are inapposite to the case *sub judice.* The Government was a party in neither State v. Galveston City Co. nor *Jadwin.*

In the former case the City Company disclaimed the Reserve. In *Jadwin*, on an inadequate record, it was held that Corps of Engineers officers had failed to prove that the land there involved was owned by the United States. 85 S.W. at 492.

scribed property is hereby conveyed to the United States of America upon the following conditions, that is to say, that the said property is to be used by the United States of America for fortifications, military or naval posts, and other public purposes of the U.S. Government, only, and if at any time it be abandoned for the purposes aforesaid, or the said property is used for any private purposes whatsoever, then in such, or any or either event, the title to said property hereby conveyed shall immediately revert to and vest in the said Galveston City Company, its successors or assigns.[9]

 The City Company argues that the Texas doctrine of estoppel by deed is effective because the United States, by accepting the 1898 deed on August 3, 1910, cannot assert that at that time there was title in anyone other than its grantor. The Government denies that its acceptance of the deed constituted an abandonment of its prior unconditional title, and contends that it is not estopped to dispute the City Company's title. We agree.

 Local, rather than federal, law applies in a land title dispute of this nature. As we said in United States v. Williams, 5 Cir. 1971, 441 F.2d 637 [1971],

> [i]n the absence of a contravening federal statute or policy, suits by the Government to protect its proprietary interests in land are local in nature. Mason v. United States, 1923, 260 U.S. 545, 558, 43 S.Ct. 200, 67 L.Ed. 396; see United States v. Standard Oil Co., [1947, 332 U.S. 301] 308–309, 67 S.Ct. 1604, [91 L.Ed. 2067]; Camfield v. United States, 1897, 167 U.S. 518, 524, 17 S.Ct. 864, 42 L.Ed. 260; Cotton v. United States, 1851, 52 U.S. (11 How.) 229, 231, 13 L.Ed. 675. (footnote omitted)

We therefore look to the Texas law to determine the validity *vel non* of the City Company's argument that in any situation, and particularly here, the reservation in the deed is contractually binding and prohibits the grantee from thereafter attempting to show that at the time of the acceptance of the deed, the grantor had no title.

To ameliorate the principle relied on as an absolute, the City Company argues that the Government, by accepting the deed, should be bound by the reverter because the deed provided these benefits: it secured title, subject to the reverter, to the entire east end of Galveston Island; it removed the fifteen acre limitation of the Reserve set by the state court in State v. Jadwin, *supra*; it strengthened the Government's claim of limitation under the five-year statute against all parties; it was of some benefit in the Cochran suit; and it was of some assistance to the Government in obtaining a later patent from the State of Texas.

We are unimpressed with this enumeration of so-called benefits. In 1898 and 1910, the Government had a valid and unconditional title to the land in question; it was not a party to or bound by the *Jadwin* decision; and the other claimed benefits are highly dubious.

When the United States requested the deed to the Reserve in 1890, clearly it did not acknowledge the claim or interest of the City Company, nor did it at any time deceive the company into believing that the United States was claiming under the deed. A fair reading of the record impels the conclusion that the Government delayed its acceptance of the City Company's deed to make certain that by accepting it there would be no relinquishment of its own title or an acknowledgment of the City Company's purported title. Consonant with congressional policy to avoid title litigation and the assertion of any adverse claims,

---

9. The District Court described this as a limitation. The parties each argued that this language created a conveyance of a fee simple upon condition subsequent. It has also been referred to by the court as a right of reentry, and by the parties as a reverter. For our purposes it is unnecessary to place it in a legal pigeonhole.

whether founded or unfounded, before appropriating funds, the 1898 deed was but one of a series of instruments obtained by the Government for these purposes.

The City Company nevertheless urges that the Government received what it bargained for and contractually bound itself by the reverter in the deed so that it cannot contend that as of the final date of acceptance, August 3, 1910, City Company did not have title to the land. It relies principally on Waco Bridge Company v. City of Waco, 1892, 85 Tex. 320, 20 S.W. 137; Greene v. White, 1941, 137 Tex. 361, 153 S.W.2d 575; and Adams v. Duncan, 1948, 147 Tex. 332, 215 S.W.2d 599. In the context of this case we find these authorities inapposite.

In *Waco* the plaintiff sought to enjoin the City from constructing a sewer across plaintiff's land. The City offered in evidence a deed to plaintiff's predecessor in title in which the grantor had reserved streets across the land and dedicated them to the public use. The court, finding that the plaintiff was estopped, held: "It was sufficient, for the purposes of this case, if it appeared that it [the deed reserving and dedicating the streets] was one of the sources under which the plaintiff claimed the land." Waco Bridge Co. v. City of Waco, *supra*, 20 S.W. at 140.

In *Greene* the court, in considering estoppel by deed, said:

> The general rule is that the grantee in a deed accepted by him is a party to the deed, even though he does not sign it, and that he is concluded by recitals in the deed and by reservations contained therein in favor of the grantor. Martin v. Roberts, 57 Tex. 564, 568; Orbeck v. Alfei, Tex.Civ. App., 276 S.W. 947; 21 Corpus Juris, p. 1095, § 81; 19 Am.Jur., p. 627, Sec. 29, p. 624, Sec. 26.

> \* \* \* \* \* \*
> \* \* \* [T]he grantee is bound by the contract in the form of a deed because he is a party to it.

*Id.* at 583–584.

Much has been said and written about *Greene* but all agree that its holding is obscure. The ultimate holding in *Greene* was that the deed executed by the grantor was ineffective to transfer homestead property. However, the court did say that, while to estop the grantee from claiming land subject to a reservation in the deed the grantor need not establish that he had good title at the time of conveyancing, 153 S.W.2d at 584, the deed is ineffective to convey or reserve anything if at the time of conveyancing, the grantee had already acquired title to the land. *Id.* at 587.

The Texas rule and an explication of *Greene* was succinctly stated in Lambe v. Glasscock, Tex.Civ.App.1962, 360 S.W.2d 169:

> The general rule in Texas is that recitals in a deed are binding only when the parties thereto claim under such deed. \* \* \* The rule in Greene v. White, supra, does not apply when the parties to the deed in question never attempted to use same in their chain of title.

*See also* Dean v. Hidalgo Water Improvement District, Tex.Civ.App.1959, 320 S.W.2d 29.

In Texas Pacific Coal & Oil Co. v. Honolulu Oil Corp., 5 Cir. 1957, 241 F.2d 920, the defendant, as lessee of an oil lease gave a farm-out letter to Bowden providing that if he would drill a well, defendant would assign him the lease, reserving a ⅟₁₆ overriding royalty. Bowden assigned the rights of the farm-out letter to plaintiff, who thereafter drilled a dry well. After the lease expired, plaintiff asked for and received the assignment; but defendant reserved in it a ⅟₁₆ overriding royalty in any future lease covering the same land made by the plaintiff with the landowners. Three years later plaintiff obtained a new lease from the original lessors and discovered oil. Defendant claimed his overriding royalty. In holding for plaintiff, this Court said:

> [A]s pointed out in the Adams and Klein cases, in order for the principle [Greene v. White—that the grantee is

concluded by the recitals in the deed reserving an interest in the grantor] to apply it must appear that the parties claimed title to their present lease *under, and so claiming used, the assignment to their advantage.*

*Id.* at 922–923 (emphasis added) (footnote omitted). The footnotes to this case also underline the necessity for the grantee's reliance on the instrument or deed in question.

"*Appellee claims title to the mineral rights here involved by virtue of the provisions in the deed* dated April 26, 1922, when the land was deeded to Henry Klein subject to the reservation of all minerals on the property in question with the right to mine the same \* \* \*.

"*The instrument dated April 26, 1922, was a contractual obligation and used by the parties herein to prove their record title. They cannot be* heard to say they are not bound by its terms. Adams v. Duncan, 147 Tex. 332, 215 S.W.2d 599, 603 stated:

" 'Since the Ford deed was not void, we think its effect is settled by Greene v. White, 137 Tex. 361, 153 S.W.2d 575, 136 A.L.R. 626. Although they did not sign the deed, *grantees Adams accepted it and subsequently used it to their advantage*; so they and petitioners, their privies, were concluded by its recitals and by the reservations therein in favor of the Duncan estate and its heirs, the respondents. \* \* \*

\* \* \* \* \* \*

" 'The grantees not only accepted the deed but they recorded it; *they used it in subsequent litigation to prove record title in themselves, and one of* them testified that they bought the land by that deed in 1906 and never owned it before; and they referred to it thereafter in conveyances affecting the land. Therefore, neither they nor petitioners as their heirs and successors in title can now be heard to say that they are not bound by its contractual obligations.' " (all emphasis supplied) Klein v. First Nat. Bank, *supra*, 266 S.W.2d 448 at pages 450 and 451.

We agree with the District Court that at no time did the United States acknowledge or claim any title under the 1898 deed from the City Company. On the contrary, both in 1910, and thereafter, the United States already held and asserted a valid, unconditional fee simple title to the land. The United States is therefore not estopped to deny the City Company's title and has clearly proved the validity of its own title.

We conclude that the record in this case amply supports the District Court's findings and that its conclusions are correct.[10]

The judgment of the District Court is Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

10. Because we decide this appeal on the issues that we have discussed, we do not reach the many other interesting questions with which the District Court dealt at length.